**Linda L. OTTO, et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. HAR 84–908.**

United States District Court, D. Maryland.

May 13, 1986.

Leslie L. Gladstone, P.A., Baltimore, Maryland, for plaintiffs Linda L. Otto and Hugh Otto.

Catherine C. Blake, Asst. U.S. Atty., Baltimore, Maryland, for defendant U.S.

## MEMORANDUM OPINION

HARGROVE, District Judge:

Plaintiffs, Hugh and Linda L. Otto, Arizona residents, filed this medical malpractice case against the National Institute of Health (hereinafter NIH) seeking recovery for the allegedly substandard treatment and care provided by Linda's physicians at NIH. Plaintiffs originally filed a claim on January 14, 1983, with the Department of Health and Human Services for an adminis-

trative settlement of 5.5 million dollars under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* The Department of Health and Human Services denied Mrs. Otto's claim on October 20, 1983. Plaintiffs filed this action on March 7, 1984, within the six-month deadline mandated by the provisions of 28 U.S.C. § 2401(b), thus, they allege that this court has jurisdiction.

Section 2401(b) of Title 28 of the United States Code states that:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

As interpreted by the courts, this section provides that:

Tort claimants filing suit against the United States can be barred by the statute of limitations in two ways: (1) they can be barred if they do not file a claim with the appropriate federal agency within two years; or (2) they can be barred even if they do file a timely administrative claim, but fail to file a suit in district court within six months after final notice of the agency's action on their claim. *Stanley Myszkowski v. United States Government,* 553 F.Supp. 66, 68 (N.D.Ill. 1982).

In this case the court finds that the plaintiff, Linda Otto, did not file her claim timely with the Department of Health and Human Services, thus, the court lacks jurisdiction over this case.

The Federal Tort Claims Act allows a party to sue the United States government for money damages for personal injury caused by the negligent or wrongful acts or omissions of any government employee while acting within the scope of his office or employment under circumstances where, if the government had been a private party, it would have been liable to the claimant under the law of the place where the acts or omissions occurred. Mrs. Otto alleges

that she was injured at NIH, a hospital owned and operated by the U.S. government located in Bethesda, Maryland. The defendant filed a motion to dismiss the case for lack of subject matter and personal jurisdiction. Plaintiffs amended their complaint without the court's permission since no responsive pleading had been filed. *See* F.R.C.P. 15.

A hearing was held before the Court, at which time the court considered three motions filed by the defendant.

The first was a motion to limit the amount of possible damages. 28 U.S.C. § 2675(b) limits the liability of the government under the Federal Tort Claims Act to the amount alleged in the administrative claim absent newly discovered evidence or intervening facts. The Ottos requested damages for 5.5 million dollars in their administrative claim and, therefore, could not request the additional one million dollars damages requested in Count II of their complaint. Thus, the court granted the defendant's motion to limit the total allowable damages in this case to 5.5 million dollars.

The second motion was to strike plaintiffs' request for a jury trial. 28 U.S.C. § 2402 states that all Federal Tort Claims Act cases are to be tried by the court without a jury, therefore, this motion was granted.

Count II of the amended complaint was filed by plaintiff Hugh Otto for a loss of consortium claim. The defendant's third motion was to dismiss Count II for lack of jurisdiction over plaintiff Hugh Otto. 28 U.S.C. § 2675(a) requires all parties who bring a federal action in this court to file an administrative claim before instituting the district court suit. The original administrative claim was in Mrs. Otto's name only and not signed by Mr. Otto. Therefore, Hugh Otto is not a proper plaintiff. The court did not rule on the motion since Count II was voluntarily dismissed by the plaintiffs at the motions hearing.

On September 15, 1985, the remaining plaintiff Linda L. Otto filed a motion for

production of documents which the court granted. On January 15, 1986, defendant filed a motion for summary judgment alleging that the plaintiff had failed to assert her claim within the two year statute of limitations as required by 28 U.S.C. § 2401(b). Plaintiff answered this motion and filed supporting memoranda. A hearing was held on April 11, 1986. The major issue discussed at the hearing was whether the case was barred by the two-year statute of limitations pursuant to 28 U.S.C. § 2401(b).

### FACTS

In May, 1978, Mrs. Linda Otto was told by her private physician in Oklahoma that since she had a high calcium level and because of her family history of hyperparathyroidism[1] she should undergo parathyroid testing. Mrs. Otto's sister, who also had a parathyroid[2] problem, contacted her own doctor regarding Linda's condition and he in turn contacted NIH.

In June of 1969, Dr. Grunfeld of NIH called Mrs. Otto and offered to have her flown to NIH for a series of tests in exchange for her participation in a "familial traceback" of hyperparathyroidism. Mrs. Otto flew to NIH in July for an evaluation and returned to Oklahoma to await the test results.

In September of 1979, Dr. Grunfeld contacted Mrs. Otto to discuss the results of her testing. He advised her to return to NIH in November to have her "bad" parathyroids removed.[3]

Mrs. Otto was admitted to NIH on November 11, 1979. Mrs. Otto and her mother discussed the proposed surgery with Dr. Grunfeld who told them that only the "bad" parathyroids would be removed during surgery and told them of the possible side effects, but never warned the plaintiff of the risk of permanent hypoparathyroidism, an abnormally low calcium level.[4] Dr. Grunfeld told them that the remaining parathyroids should begin functioning approximately six months after surgery and that Mrs. Otto would no longer suffer from hyperparathyroidism or need medication after that six month period. Mrs. Otto was also informed that NIH would supply her with medication for as long as needed.

Prior to the operation Mrs. Otto signed a consent form [Exhibit 3 to Linda Otto's Deposition] permitting "administration of anesthesia and performance of operations and other procedures," but claims in her complaint that the document she signed did not contain the phrase "remove the four parathyroids" which now appears therein.

On November 14, 1979, Drs. Brennan and Grunfeld operated on the plaintiff. When Mrs. Otto regained consciousness in intensive care, she was told by Drs. Brennan and Grunfeld that most of her "good" parathyroids were removed during the surgery and that only one half of a parathyroid gland remained. Mrs. Otto was "shocked and concerned" that they removed more parathyroid tissue than she had expected.

After the surgery the plaintiff was also told that a portion of one of the parathyroids that had been removed would be frozen and kept at NIH. She was informed that this had been done to prevent another operation on her neck, and that the frozen

1. Hyperparathyroidism is a condition where the body, due to an oversecretion of hormones, maintains an abnormally high circulatory level of calcium (hypercalcemia) and a low circulatory level of phosphate (hypophosphatemia). *Attorneys' Textbook of Medicine*, Section 18A.51(1) (R. Gray 3rd. ed. 1986).

2. The parathyroid glands are four small glands that lie adjacent to the thyroid gland in the neck. Their primary function is to maintain the body's calcium level. *Gray, supra* at Section 18A.51.

3. Most cases of hyperparathyroidism are the result of growths on one or more of the four parathyroid glands. The removal of these "bad" glands can result in the restoration of a normal calcium balance. *Gray, supra* at Section 18A.51(1).

4. Hypoparathyroidism most commonly occurs as a result of surgical excision of the parathyroids or trauma to the glands in the course of thyroid surgery. *Gray, supra* at Section 18A.51(3).

parathyroid tissue would be implanted later if her remaining one-half parathyroid did not perform properly. It was at this time that the possibility of a need for a graft of frozen tissue was first mentioned. Shortly after the surgery, Mrs. Otto's mother asked Dr. Grunfeld why he had removed the "good" glands. He replied, in Linda Otto's presence, that he decided to take the "good" glands to see if the human body could function without them.

Plaintiff was discharged from the hospital on November 23, 1979. Before her discharge she was advised to stay under constant medical care at home and to have her blood levels measured regularly for changes in her calcium level. Three or four days after returning home, Mrs. Otto developed a staph infection in her neck which Dr. Gearhart, her private physician, treated. At this time, she told him about the surgery and asked whether the doctors at NIH might have removed too much parathyroid gland. He responded that he did not know anything about that kind of operation. Mrs. Otto did not consult any other physician about her surgery or the consequences of the removal of nearly all of her parathyroid glands during her NIH surgery.

Mrs. Otto was too weak to continue working, so in March of 1980 she left Oklahoma to visit her sister in Florida. While in Florida, Mrs. Otto began to feel ill and therefore contacted Dr. Fuller. Dr. Fuller called Dr. Grunfeld at NIH and was told that along with the parathyroid glands, Mrs. Otto's thymus gland had also been removed. Dr. Fuller then relayed this information to Mrs. Otto who was unaware that the procedure had been performed. Although Mrs. Otto understood that the loss of her thymus gland would adversely affect the production of estrogen she would need later in life, she did not consult with any doctor about this.

In May of 1980, Mrs. Otto arrived in California and accepted a position at Northridge Hospital as a Unit Clerk. While in California, she began seeing Dr. Brickman, an endocrine specialist at a Veterans Administration Hospital. Dr. Brickman spoke to the doctors at NIH about Mrs. Otto's surgery and performed a series of tests on her. Shortly thereafter Dr. Brickman advised Dr. Grunfeld that Mrs. Otto's calcium level was not stabilizing. Dr. Grunfeld called Mrs. Otto and suggested she return to NIH for an autograft of the frozen parathyroid tissue.

In August of 1980, Mrs. Otto went back to NIH. Dr. Grunfeld spoke to her briefly upon her admission but ended his NIH employment shortly after she arrived. Dr. Schaefer and another NIH physician prepared Mrs. Otto for her autograft operation. At this time, Dr. Schaefer told Mrs. Otto that she should have tried to control her calcium level through her diet rather than through surgery.

Dr. Brennan performed the autograft surgery, placing several pieces of frozen tissue in Mrs. Otto's left forearm. Mrs. Otto was told that she needed the autograft because the parathyroid tissue in her neck was dead due to the earlier staph infection.

In September, 1980, plaintiff began seeing Dr. Brickman in California again. Shortly thereafter, she fell and injured her arm. She developed a staph infection in her arm, which was treated by her doctor at "Maxicare."

Dr. Brickman was again unable to stabilize Mrs. Otto's calcium level, so in April of 1981 she returned to NIH for a second autograft operation.[5] Before the operation was performed, Mrs. Otto was told that if the second autograft did not work nothing

---

**5.** To perform the first autograft operation, the doctors had to cut and shorten the muscle in Mrs. Otto's arm. This caused her difficulty when she went into tetany. Tetany is a condition characterized by cramps, convulsions, twitching of the muscles, and sharp flexion of the wrist and ankle bones. It is a manifestation of an abnormality in calcium metabolism, which can occur in association with hypoparathyroidism. *Dorland's Illustrated Medical Dictionary*, (Dorland, W. 26th ed. 1981) at 1351. For this reason, plaintiff refused to have the second autograft in her right arm, so the tissue was placed in her left arm again.

more could be done for her, and she would suffer from permanent hypocalcemia.

On October 31, 1981, plaintiff moved to Arizona and began seeing Dr. Aronoff, an endocrinologist. She filed her administrative claim on January 14, 1983. The claim stated that she suffers from hypoparathyroidism and alleged negligent treatment and care as to the 1979 surgery, failure of the physicians to inform her sufficiently of her options, and her lack of consent to the procedure which was performed in 1979.

At the second motions hearing, the defendant argued that Mrs. Otto's complaint is barred by the two-year statute of limitations contained in the Federal Tort Claims Act, 28 U.S.C. § 2401(b), therefore, pursuant to F.R.C.P. 56 the government is entitled to summary judgment as a matter of law.

In response, the plaintiff attempted to show that her claim was in fact, not barred by the statute of limitations. Plaintiff asserted that the treatment she received at NIH, the initial surgery, the first autograft and the second autograft were merely parts of a single plan of overall treatment. Plaintiff argued that when it became apparent that Mrs. Otto would need an autograft, the doctors at NIH told her it would take six months from the date of the August 1980 autograft operation for her calcium level to stabilize. As a result, she did not have "knowledge" of her injury until that time (approximately February 1981), thus, plaintiff alleges, her claim was within the two-year statute of limitations.

### APPLICABLE LAW

Mrs. Otto filed her administrative claim on January 14, 1983, therefore, pursuant to 28 U.S.C. § 2401(b) she is barred from bringing her suit if the court finds that her claim accrued before January 14, 1981, and that there are no circumstances recognized by the law which would prevent the statute of limitations from expiring.

The Federal Tort Claims Act allows a private person to sue the U.S. government, however, any such claim "shall be forever barred unless presented in writing ... within two years after such claim accrues ..." 28 U.S.C. § 2401(b). The Federal Tort Claims Act provides for a limited waiver of the United States' sovereign immunity, and this waiver "should be neither extended nor narrowed by the courts." *U.S. v. Kubrick*, 444 U.S. 111, 117–118, 100 S.Ct. 352, 356–357, 62 L.Ed.2d 259 (1979).

Federal law governs the accrual of an action under the Federal Tort Claims Act, and under federal law a cause of action generally accrues at the time of injury. In medical malpractice cases the injury may not immediately manifest itself, thus, many circuit courts have adopted the standard of "blameless ignorance", which may be applied to decide when a plaintiff's claim has accrued. *See Casias v. U.S.*, 532 F.2d 1339, 1340 (10th Cir.1976) and *Portis v. U.S.*, 483 F.2d 670, 672 (4th Cir.1973). "Blameless ignorance" means that an injured party's claim will not accrue until the plaintiff discovers, or in due diligence should have discovered, the acts constituting the alleged malpractice. *Casias v. U.S.*, 532 F.2d at 1340. The courts have stated that "when the facts become so grave as to alert a reasonable person that there may have been negligence related to the treatment received, the statute of limitations begins to run." *Reilly v. U.S.*, 513 F.2d 147, 150 (8th Cir.1975). Serious and unexpected consequences of treatment are sufficient to put a person on notice that he may have been legally wronged. *Id.* at 150.

In 1979, the Supreme Court stated that in determining when a malpractice claim accrues the plaintiff need not be actually told that the acts which caused his or her injury might constitute negligence, and that nothing more than knowledge of injury and causation is required for a claim to accrue. *U.S. v. Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359. In that case, the plaintiff, Kubrick, was treated at a Veterans Administration hospital for an infection in his leg in April of 1968. Following plaintiff's surgery the infected area was "irrigated" with neomycin, an antibiotic. Later, approxi-

mately six weeks after his discharge from the hospital, plaintiff noticed a ringing in his ears and some loss of hearing. His condition was diagnosed by an ear specialist, Dr. Soma, as bilateral nerve deafness. This diagnosis was confirmed by several other specialists. One specialist, Dr. Sataloff, obtained plaintiff's records from the V.A. hospital in January 1969 and told plaintiff it was "highly likely that the loss was the result of the neomycin treatment."

Plaintiff filed an administrative claim for an increase in his disability benefits in September 1969. This claim was denied, and on resubmission denied again on the grounds that no causal relationship existed between the treatment and the hearing loss and that there was no evidence of ... "negligence on the part of the government." In 1972 Kubrick filed suit against the U.S. government under the Federal Tort Claims Act alleging he had been injured by negligent treatment at the VA Hospital.

The district court ruled in favor of the plaintiff, rejecting the government's claim that the two-year statute of limitations had expired and that Kubrick's action was therefore barred. The government asserted that the claim had accrued in January of 1969 when Kubrick learned from Dr. Sataloff that his hearing loss had probably resulted from the neomycin treatment. The district court held that it was "[un]reasonable to start the statute running until the plaintiff had reason at least to suspect that a legal duty to him had been breached. *Kubrick*, 444 U.S. at 116, 100 S.Ct. at 356. The district court found that Kubrick had no reason to suspect negligence until his conversation with Dr. Soma in 1971. The Court of Appeals affirmed.

The Supreme Court granted certiorari and reversed the lower courts. The Supreme Court found that in January of 1969, when Dr. Sataloff told the plaintiff that his hearing loss was "probably" due to the treatment he received at the VA Hospital, Kubrick was aware of both his injury and its probable cause. The Supreme Court rejected the rule adopted by the Court of

Appeals for the Third Circuit that a putative plaintiff's claim does not accrue until he knew or reasonably could be expected to know that in the eyes of the law, his treatment constituted malpractice. *Kubrick*, 444 U.S. at 113, 100 S.Ct. at 354. The Supreme Court held that "the fact one has been injured may be unknown or unknowable until the injury manifests itself, and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical fact that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged and he need only ask." *Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359.

The Supreme Court held that once Dr. Sataloff mentioned the acts may have constituted malpractice Kubrick need only have made inquiries among doctors to have discovered that he probably had a good cause of action for a malpractice case. The difficulty is that although the Supreme Court found he "had been in possession of the critical facts about the cause of his injury since January 1969," he never made any inquiry as to whether his injury was negligently inflicted. *Kubrick*, 444 U.S. at 123, 100 S.Ct. at 360. The Supreme Court stated that a plaintiff, armed with the facts about the harm done to him can protect himself by seeking advice in the medical and legal community. "But however or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not ... [i]f he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury." *Kubrick*, 444 U.S. at 124, 100 S.Ct. at 360.

This case is factually indistinguishable from Kubrick. Mrs. Otto knew she had been injured immediately upon waking from her surgery, when the doctors told her they had removed the "good" parathyroids. At that moment, she was in possession of the critical fact that she had been injured and she knew who had inflicted the injury, so the statute of limitations began to run. Although Mrs. Otto did consult with her private doctor about the surgery and he claimed not to know "anything about that kind of operation," *Kubrick* clearly states that the statute of limitations nonetheless is not tolled.

Even if one were to decide that the removal of the "good" glands would not have alerted a reasonable person that he or she had been harmed, there were several other incidents which occurred before January 1981 that should have led Mrs. Otto to realize she had been wronged: for example, Dr. Grunfeld stated in Mrs. Otto's presence that he had removed the "good" glands to see if the human body could function without them; Mrs. Otto experienced severe complications after her surgery including a massive staph infection in her neck, a ringing in her ears and an exhaustion which prevented her from continuing her work; Mrs. Otto learned that her thymus gland had been removed despite the fact she never consented to that procedure; and that in August of 1980 an NIH doctor told her that she should have tried to control her calcium level through her diet rather than surgery.

Plaintiff argues that there is nonetheless a genuine dispute of material fact concerning the statute of limitations issue. First, Mrs. Otto asserts that the testimony in Drs. Saxe and Grunfeld's depositions provides the reasonable doubt element necessary to make the granting of the government's motion for summary judgment inappropriate. Plaintiff claims that the court should not rely solely on the deposition of Mrs. Otto when it determines the date on which her claim accrued, but the court should consider the physicians' testimony as well.

In *Lynch v. U.S. Dept. of Army Corps.*, 474 F.Supp. 545, 549 (D.Md.1978), however, the court stated that a plaintiff should be bound by his or her own statement made in the course of an administrative proceeding as to the date his or her action accrued. Plaintiff contends that the doctor's testimony is presented to the court for the "purpose of allowing the court to gain a full understanding of the acts of the parties in question." It seems clear that plaintiff is merely attempting to cloud the main issue of injury and causation. It is plaintiff's testimony alone that the court must look to to determine when the cause of action accrued, thus, this argument is rejected.

Secondly, at the second motions hearing, plaintiff argued that she had no reason to believe she had been injured until at least six months after her first autograft operation—sometime in February of 1981. This is based on the assertion that each step of her treatment, the surgery, autograft one and autograft two were only parts of one large plan and that she did not know until at least after the first parathyroid autograft had failed that the expected result would not occur.

This type of "continuing tort" argument has been repeatedly rejected by courts when construing 28 U.S.C. § 2401(b). As the U.S. District Court for the District of Maryland has held:

"[the] plaintiff may not in effect, hide its head in the sand, ignoring the accrual of a cause of action until the two-year statute of limitations has expired and then attempt to circumvent the limitations by alleging a combination of torts or a continuing tort. *Lynch*, 474 F.Supp. at 549 citing *United Mo. Bank South v. U.S.* 433 F.Supp. 571, 577 (W.D.Mo.1976).

Furthermore:

"Under the Federal Tort Claims Act one who knows that an injurious tort has been committed against him may not delay the filing of his suit until the time, however long, when he learns the precise extent of the damage resulting from the tort ... the running of a statute of limitations does not await determination of

the full extent of injury." *Lynch*, 474 F.Supp. at 549 citing *Portis*, 483 F.2d at 672.

Plaintiff's argument that she did not know she had been injured until she learned she would be permanently hypocalcemic must be rejected.

Lastly, plaintiff argues that her complaint was timely because the doctrine of continuous treatment should apply to toll the running of the two-year statute of limitations. In *Kossick v. U.S.*, 330 F.2d 933 (2nd Cir.1964), the court stated that it is federal law that determines whether and how that doctrine applies to actions based on the Federal Tort Claims Act. "The doctrine has been favorably mentioned ... but this court has not found it embodied in any federal law holding. The cases typically assume its existence and find it inapplicable on the facts". *Kelly v. U.S.*, 554 F.Supp. 1001, 1003 (1983). The court continued, "As so formulated, the continuous treatment doctrine is not an exception to the requirement of reasonable diligence set forth in the *Kubrick* case but rather a factor in determining whether that requirement has been met." *Id.* at 1004.

In this case the doctrine of continuous treatment is not applicable even as a factor in determining reasonable diligence in the discovery of a claim. The doctrine of continuous treatment is premised on the notion that a person is entitled to place confidence in his physician and that this relationship excuses the claimant from challenging the quality of care he is receiving until this confidential relationship terminates. *Brown v. U.S.*, 353 F.2d 578 (9th Cir.1965).

■ The doctrine of continuing treatment will not apply if the plaintiff has received treatment from other physicians during the period he or she seeks to delay the operation. "It is the continued existence of the physician-patient relationship which tolls the statute of limitations. Once this personal, confidential relationship terminates, the patient must exercise diligence in seeking a remedy for any suspected wrongdoing on the part of his physician."

*Ciccarone v. U.S.*, 486 F.2d 253 (3rd Cir. 1973).

Between November 1979 and May 1980 Mrs. Otto consulted with not only her private physician, Dr. Gearhart, but contacted Dr. Fuller in Florida and Dr. Brickman, an endocrine specialist, as well. These visits effectively terminated the intimate relationship that the doctrine of continued treatment seeks to protect.

■ Furthermore, the interest in preventing stale claims convinces the court that the "blameless ignorance" doctrine has no merit when a person knows of the acts constituting negligence. *Reilly v. U.S.*, 513 F.2d 147, 150 (8th Cir.1975) citing *Tyminski v. U.S.*, 481 F.2d 257, 265 (3rd Cir.1973).

As previously discussed this court believes that Mrs. Otto knew of the injury inflicted upon her immediately after surgery. It is clear from the evidence before the court that the doctrine of continuous treatment is inapplicable in this case.

■ After the second motions hearing the plaintiff filed a Motion for Leave to Amend the Complaint. Although it is true that leave to amend the complaint should be granted liberally, see F.R.C.P. 15(a), in this case the court will deny plaintiff's motion. Plaintiff, although she did not cite F.R.C.P. 15(c) in her motion, is relying upon that portion of the rule under which an amended complaint relates back to the date of the original pleading, "whenever the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." It is clear that the plaintiff is trying to add new allegations which relate back to the November 14, 1979 operation, but which she argues would circumvent the statute of limitations bar discussed in this opinion. The two allegedly negligent acts described in the Motion for Leave to Amend the Complaint were not mentioned in the plaintiff's claim with the Department of Health and Human

Services, filed on January 14, 1983,[6] and thus are not within the subject matter jurisdiction of this case. *See* 28 U.S.C. § 2675. The court finds that these two new claims:

"[t]hat recently-taken discovery depositions have revealed negligent acts that occurred on or about November 14, 1979 in the failure of defendant to cryopreserve plaintiff's parathyroid tissue; [and], [t]hat recently-taken discovery depositions have revealed negligent acts that occurred on or about August 13, 1980 and April 1, 1981 in the negligent freezing or thawing of plaintiff's parathyroid tissue and failure to advise the plaintiff of those facts prior to the autograft procedures",

were reasonably discoverable at the time plaintiff filed her original claim. Thus, even if the court were to grant plaintiff's motion, these additional allegations of negligence would also be barred by her failure to comply with the jurisdictional prerequisite of 28 U.S.C. § 2401(b).

## CONCLUSION

After a careful review and consideration of the complete record in this case, the court finds that the plaintiff knew or had a reasonable basis to know that she had been injured almost immediately after her surgery at NIH on November 14, 1979. It is also clear that the two exceptions to the two-year statute of limitations rule, the "blameless ignorance" doctrine or "continuous treatment" theory, are inapplicable to this case. As soon as the plaintiff realized that some of her "good" parathyroid glands had been removed, the facts concerning her surgery did "become so grave as to alert a reasonable person that there may have been negligence related to the treatment received." *Reilly,* 513 F.2d at 147. The plaintiff also contacted private doctors other than the physicians at NIH so the plaintiff's evidence in this case can not support her continuous treatment argument. Therefore, because the administra-

tive claim was not filed until January 14, 1983, and the allegedly negligent acts occurred in November, 1979, the plaintiff's complaint is barred by the statute of limitations for federal tort claims as set forth in 28 U.S.C. § 2401(b).

Accordingly, the defendant's Motion for Summary Judgment is granted and the plaintiff's Motion for Leave to Amend the Complaint is denied.

---

6. Although Mrs. Otto signed her claim on December 14, 1982, the Public Health Claims Office received and filed it on January 14, 1983.