**Linda L. OTTO, Plaintiff-Appellant,**

**Hugh Otto, Plaintiff,**

v.

**NATIONAL INSTITUTE OF HEALTH, Defendant-Appellee.**

No. 86–3993.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1987.

Decided April 8, 1987.

Leslie L. Gladstone, on brief, for plaintiff-appellant.

Catherine Curtis Blake, First Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., on brief), for defendant-appellee.

Before WIDENER and HALL, Circuit Judges, and SENTELLE, United States District Judge for the Western District of North Carolina, sitting by designation.

K.K. HALL, Circuit Judge:

Linda L. Otto appeals an order of the district court granting summary judgment for the United States of America and denying appellant leave to amend her complaint in this medical malpractice action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* ("FTCA"). Contrary to the conclusion reached by the district court, we hold that Otto's action is not barred by the FTCA's two-year statute of limitations. We, therefore, reverse the district court's decision and remand the matter for further proceedings consistent with this opinion.

## I.

According to the evidence developed during discovery, in May, 1978, Otto's private physician in Oklahoma recommended that she undergo parathyroid testing due to her high calcium levels and family history of hyperparathyroidism.[1] Otto was eventually referred to the National Institutes of Health ("NIH") in Bethesda, Maryland, where she was evaluated and advised by NIH physician Carl Grunfeld, M.D., to undergo surgery for the removal of her "bad parathyroids." A person normally has four to six parathyroid glands. Otto claims that before the operation she was told that her "good" parathyroids would not be removed and that within six months of the surgery those glands should begin to function properly. She further alleges that she was not warned of any danger of permanent low levels of calcium, a condition known as hypoparathyroidism.

Dr. Grunfeld and another NIH physician, Murray F. Brennan, M.D., performed the surgery on November 14, 1979. Immediately after the surgery, they told Otto that they had removed all of her "good" and "bad" parathyroid tissue, except for one-half of a "good" gland. The physicians also informed appellant that a portion of the "good" parathyroid tissue had been frozen in case a transplant or graft of that tissue would ever become necessary.

When told of these results, Otto expressed shock and concern. However, she claims that Dr. Brennan assured her that the frozen tissue would never have to be used and that the reason the "good" parathyroids had been removed was to prevent another operation on her neck. Before Otto was transferred out of intensive care, however, her mother had asked Dr. Grunfeld why he had taken the "good" glands. He replied, in Otto's presence, that he decided to take the "good" glands to see if the human body could function without them. Otto states that, based on this conversation with Dr. Grunfeld, she reached the conclusion that the procedure which she had undergone was experimental.

Appellant was discharged from the hospital on November 23, 1979, after being told to stay under constant medical care at home and to have her blood regularly tested for changes in her calcium levels. Following Otto's discharge, Dr. Grunfeld re-

---

1. Hyperparathyroidism is an abnormal endocrine condition in which an excess of parathyroid hormone is secreted by the parathyroid glands, causing hypercalcemia or greater than normal amounts of calcium in the blood. *Mosby's Medical and Nursing Dictionary,* 1983.

ceived phone calls from her and assisted her in locating physicians near her home to monitor her condition. Shortly after returning home, appellant discovered that she had developed a staph infection in her neck, which was treated by her Oklahoma physician, Dr. Gearhart. Otto states that when she asked Dr. Gearhart whether too much parathyroid tissue might have been removed, he replied that he was not familiar with that type of surgery.

Otto continued to experience problems, including ringing in her ears and weakness, following the surgery. She ceased working and left Oklahoma in March, 1980, to visit her sister in Florida and eventually to resettle in California in May, 1980. Appellant consulted physicians in these states and in each case the physicians contacted NIH in the course of their treatment. On one occasion, Dr. Grunfeld mentioned that Otto's thymus gland had also been removed during the surgery, a fact about which appellant was previously unaware. When informed by Otto's California physician in May, 1980, that appellant's condition was not stabilizing, Dr. Grunfeld contacted her and advised her to return to NIH for a transplant.

In August, 1980, Otto was admitted to NIH, where several pieces of her previously frozen tissue were transplanted into her left forearm. During this admission, another NIH physician, Dr. Schaefer, told her that she should have tried to control her calcium problem through diet rather than surgical removal of the glands. Dr. Brennan also informed appellant at this time that the transplant was necessary because the parathyroid tissue in her neck had died as a result of the earlier staph infection.

One month later, Otto learned that she had developed another staph infection in her arm, which was treated in California. When her condition again failed to stabilize, she returned to NIH for a second transplant of her preserved tissue, which took place in early April, 1981. Before this procedure was performed, Otto was told

that if it was not successful, nothing more could be done for her. She moved to Arizona in October, 1981, and began seeing an endocrinologist there. She continued to experience problems, including tetany, a condition associated with hypoparathyroidism, which is characterized by cramps, convulsions, and twitching of the muscles.

On January 14, 1983, Otto filed her FTCA administrative claim. After the claim was denied on October 20, 1983, she brought the instant action on March 7, 1984. During the course of discovery, the government moved for summary judgment, arguing that Otto had failed to file her administrative claim within the FTCA's two-year statute of limitations. Shortly thereafter, Otto moved for leave to amend her complaint with additional claims that NIH was negligent in failing to properly freeze or thaw appellant's parathyroid tissue following her November, 1979, surgery and in failing to advise her of those facts before the two transplant procedures.[2]

The district court granted the government's motion for summary judgment, reasoning as follows:

> Mrs. Otto knew she had been injured immediately upon waking from her surgery, when the doctors told her they had removed the "good" parathyroids. At that moment, she was in possession of the critical fact that she had been injured and she knew who had inflicted the injury, so the statute of limitations began to run ...

> Even if one were to decide that the removal of the "good" glands would not have alerted a reasonable person that he or she had been harmed, there were several other incidents which occurred before January 1981 that should have led Mrs. Otto to realize she had been wronged: for example, Dr. Grunfeld stated in Mrs. Otto's presence that he had removed the "good" glands to see if the human body could function without them; Mrs. Otto experienced severe complications after her surgery including a

---

**2.** These new claims were based upon information obtained during discovery that the tissue inserted into Otto's arm during the transplant procedures could not be confirmed as parathyroid tissue.

massive staph infection in her neck, a ringing in her ears and an exhaustion which prevented her from continuing her work; Mrs. Otto learned that her thymus gland had been removed despite the fact she never consented to that procedure; and that in August of 1980 an NIH doctor told her that she should have tried to control her calcium level through her diet rather than surgery.

*Otto v. United States,* 634 F.Supp. 381, 387 (D.Md.1986).

The district court rejected appellant's argument that the doctrine of continuous medical treatment operated to toll the statute of limitations until all treatment related to the original injury was completed. According to the district court, the doctrine was inapplicable due to the treatment Otto had received from her private physicians subsequent to her surgery at NIH. *Id.* at 388. Finally, the district court denied Otto's motion for leave to amend her complaint, concluding that the additional allegations of negligence would also be barred by the two-year statute of limitations. *Id.* at 388–89.

This appeal followed.

## II.

■ On appeal, Otto contends that her action is not barred by limitations and that she acted with reasonable diligence in discovering her claim. Under the unusual circumstances presented by this case, we agree.

28 U.S.C. § 2401(b) provides that:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

In *United States v. Kubrick,* 444 U.S. 111, 123–24, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979), the United States Supreme Court held that a claim accrues under this statute and the limitations period begins to run when a claimant knows both the existence and the cause of his injury.

Nevertheless, as a number of courts have recognized, where there has been a course of continuous medical treatment, a claim may not accrue until the end of that course of treatment, if the treatment has been for the same illness or injury out of which the claim for medical malpractice arose. *Page v. United States,* 729 F.2d 818, 823 n. 36 (D.C.Cir.1984). *See also, Kossick v. United States,* 330 F.2d 933, 936 (2d Cir.1964), quoting *Borgia v. City of New York,* 12 N.Y.2d 151, 156, 237 N.Y. S.2d 319, 321–22, 187 N.E.2d 777, 779 (1962); *Rispoli v. United States,* 576 F.Supp. 1398, 1401–03 (E.D.N.Y.1983). *Cf. Reilly v. United States,* 513 F.2d 147, 150 (8th Cir.1975); *Tyminski v. United States,* 481 F.2d 257, 264 n. 5 (3d Cir.1973); *Ashley v. United States,* 413 F.2d 490, 493 (9th Cir.1969) (continuous treatment doctrine not available to toll statute of limitations in medical malpractice action brought under FTCA where plaintiff knows of the acts constituting negligence).

■ The continuous treatment doctrine is based on a patient's right to place trust and confidence in his physician. Under the doctrine, the patient is excused from challenging the quality of care being rendered until the confidential relationship terminates. *Brown v. United States,* 353 F.2d 578, 580 (9th Cir.1965). Stated another way, the doctrine permits a wronged patient to benefit from his physician's corrective efforts without the disruption of a malpractice action. *See Borgia, supra.*

■ In the instant case, we are confronted with a somewhat unique set of facts. Between the time of her initial surgery in November, 1979, until the time of the second transplant in April, 1981, Otto's parathyroid disease was unquestionably being treated at NIH. This institution was in fact one of only a few facilities in the nation with the expertise to treat appellant's illness and is uniformly recognized for its role in pioneering innovative and experimental techniques of medical diagnosis and treatment. Although Otto's care at NIH was supplemented with the follow-up

treatment of local private physicians, that additional treatment was rendered at the advice and under the direction of the NIH physicians, to whom the private doctors consistently and repeatedly deferred. Otto had virtually no alternative but to exhaust all of the possible treatment options proposed by NIH. Under such circumstances, we cannot accept the district court's conclusion that the doctrine of continuous care is inapplicable.

■ Nor are we convinced that Otto should have known that she was injured before the failure of the final treatment option in April, 1981. Although following the initial surgery Otto had expressed concerns about the extent of the surgery performed, she was given reasonable and credible explanations for the procedure and for the complications that ensued. She was told to expect some temporary hypocalcemia and was reassured by her NIH physicians that her remaining parathyroid tissue should begin to function normally within six months. Furthermore, she was told that in the event that this tissue did not function properly in the future, a transplant could be performed to correct any problem and that the risk of permanent hypocalcemia was virtually nonexistent. Following the failure of the first transplant, Otto underwent a second transplant procedure at NIH. It was only during the second transplant in April, 1981, that Otto learned that nothing more could be done for her and that she would experience permanent hypocalcemia if this procedure proved unsuccessful. Given these facts, Otto's claim for malpractice could not have accrued until after the second transplant when she became aware of the true nature of her permanent and irreparable injury. We, therefore, hold that her administrative claim, filed on January 14, 1983, was within the FTCA's two-year statute of limitations.

III.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further proceedings.[3]

REVERSED AND REMANDED.

3. Appellant also argues that the district court erred in denying her leave to amend her complaint. Given our disposition of the limitations issue and our decision to remand this matter, we conclude that appellant should be permitted on remand to renew her motion to amend her complaint with the additional claims concerning the transplanted tissue, if she so desires. We express no view on whether the amendment should be permitted without first requiring her to file a new administrative claim, but leave that issue for the consideration of the district court.