**Margarito ESPINOZA, Plaintiff**

v.

**UNITED STATES of America, Defendant.**

**No. 88 C 2762.**

United States District Court, N.D. Illinois, E.D.

June 16, 1989.

---

Bruce Kreisman, Goldstein & Fluxgold, Chicago, Ill., for plaintiff.

Tom Walsh, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Margarito Espinoza ("Espinoza") has sued the United States of America ("United States") under the Federal Tort Claims Act (the "Act"), 28 U.S.C. §§ 2671–2680,[1] charging medical malpractice. In response the United States has moved under Fed.R. Civ.P. ("Rule") 12(b)(1) to dismiss the First Amended Complaint (the "Complaint") and this action for lack of subject matter jurisdiction—more precisely, for untimeliness under Section 2401(b). For the reasons stated in this memorandum opinion and order, the motion to dismiss is granted.

### Facts [2]

Beginning in July 1977 and continuing through September 9, 1986 Espinoza was treated at Edward Hines, Jr. Hospital ("Hospital"), operated by the United States through the Department of Veterans Administration ("VA"). In July 1977 and October 1979 surgical procedures were performed on Espinoza's inner ear at the Hospital. At all other times his visits to the Hospital related to hearing loss, earaches and dizziness, nausea and pain associated with the conditions that either necessitated the surgical procedures or resulted from the surgical procedures.

According to Complaint ¶ 4, beginning on March 19, 1979 and during a continuous course of conduct extending through September 9, 1986 doctors employed at the Hospital failed to diagnose and treat properly (both pre- and post-operatively) a temporal mandibular joint (TMJ) syndrome problem suffered by Espinoza.[3] That failure caused Espinoza's injuries described in Complaint ¶ 5 as "loss of hearing, loss of feeling and movement in fact [sic] and jaw, quivering of jaw and pain."

Facts adduced by the United States and undisputed by Espinoza flesh out the barebones allegations of the Complaint. Dr. Bruce Bloom,[4] an expert retained by Espinoza, testified medical records indicated the onset of TMJ syndrome was in 1979 *after* the surgical procedure (and it was probably caused by the procedure). Records of Dr. George Goldstein (an eye, ear, nose and throat physician not employed by the United States) reflect visits to him by Espinoza beginning in December 1980, with a diagnosis of TMJ syndrome [5] and the prescription of a "TMJ regimen" at that time. Dr. Debra Klein (a dentist also not associated

---

1. Further citations to relevant provisions of the Act will take the form "Section—," referring to the Title 28 numbering rather than the Act's own internal numbering.

2. On a Rule 12(b)(1) motion the well-pleaded factual allegations of the Complaint plus any added factual submissions by plaintiff are accepted as true, with all reasonable inferences drawn in plaintiff's favor. Here the United States does not dispute any of the factual allegations, but it relies in part on matters outside the Complaint: Espinoza's complaint in a previous case, his medical records and certain deposition testimony. Espinoza makes no attempt and adduces no evidence to contradict any of the additional facts presented. *Kontos v. United States Department of Labor*, 826 F.2d 573, 576 (7th Cir.1987) teaches:

   [W]hen the party moving for dismissal under Rule 12(b)(1) challenges the factual basis for jurisdiction, the nonmoving party (i.e., the plaintiff) must submit affidavits and other relevant evidence to resolve the factual dispute regarding the court's jurisdiction.

   Under these circumstances this Court may properly consider the evidence tendered by the United States (*Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979), citing *Gibbs v. Buck*, 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939)), and because Espinoza has contradicted none of it, this Court will accept that evidence as true for purposes of this motion.

3. TMJ syndrome, also known as "myofacial pain dysfunction" ("MFPD"), is manifested by pain in and around the temporal mandibular joint (jaw joint), pain and tenderness in the areas of chewing and a clicking sound when the patient moves the mouth (Bloom Dep. 12).

4. Dr. Bloom has a double doctorate—in dentistry (a D.D.S. degree) and in law (a J.D. degree).

5. Dr. Goldstein's December 17, 1980 notes refer to MFPD, a diagnosis synonymous with TMJ syndrome (see n. 3).

with the United States) examined Espinoza in September 1984 and also diagnosed TMJ syndrome.

### Litigation History

On October 19, 1981 Espinoza filed a malpractice action in this Court against the United States, the VA and three VA doctors (*Espinoza v. United States*, 81 C 5794 (N.D.Ill.)).[6] Count I of that complaint alleged negligence by the United States on and after July 25, 1977, while Count II alleged negligence on and after March 19, 1979. Both counts charged such negligence caused "loss of feeling and movement in face and jaw and pain" (Count I ¶ 11, Count II ¶ 8), although TMJ syndrome was not identified by that name. Count III ¶¶ 5–7 alleged that a VA doctor "intentionally and maliciously concealed and misrepresented" to Espinoza that his treatment had been competent and not negligently performed. Count III ¶ 9 alleged Dr. Goldstein had ascribed Espinoza's injuries to negligence in the 1977 and 1979 surgeries, and Count III ¶ 10 charged the VA doctor with having disputed Dr. Goldstein's diagnosis (allegedly more misrepresentation and concealment).

After the United States responded by pointing out Espinoza's need to satisfy the statutory precondition of an administrative claim before bringing suit (Section 2675(a)), Espinoza's lawyer moved orally for dismissal. This Court dismissed the 1981 action with prejudice as to the individual defendants (who were not proper defendants), and without prejudice as to the United States because of Espinoza's noncompliance with Section 2675(a).

Several years passed. Then on September 2, 1986 an administrative tort claim was filed with the VA,[7] charging the VA's failure to diagnose TMJ syndrome and stating Espinoza "first knew or should have known" of the claim on March 27, 1985. On February 13, 1987 an amended claim was submitted, changing the "first knew or should have known" date to September 11, 1984.

After the government's denial of the administrative claim Espinoza filed the current action. It was initially assigned to the calendar of this Court's colleague Judge James Holderman (that was in accordance with this District Court's regular system of random assignment, because the action had not been specified as the refiling of a previously dismissed case). When that status as a refiled case was identified, the case was reassigned to this Court's calendar in accordance with this District Court's General Rule 2.21(d)(2).

### Jurisdictional Time Limitation

■ Section 2401(b) states in pertinent part:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues....

For that purpose a claim "accrues" when a plaintiff discovers an injury and the cause of that injury (*United States v. Kubrick*, 444 U.S. 111, 120–22, 100 S.Ct. 352, 358–59, 62 L.Ed.2d 259 (1979)). Accrual is not dependent on "awareness by the plaintiff that his injury was negligently inflicted," as long as he knows who has inflicted that injury (*id.* at 122–23, 100 S.Ct. at 359–60).

■ As already indicated, the time interval between Espinoza's asserted first knowledge (September 11, 1984, according to his amended claim filed February 13, 1987) and his initial filing of an administrative claim (September 2, 1986) was less than two years. Were that an accurate account, this action would not be time-barred by Section 2401(b).

But the uncontroverted evidence gives the lie to that timetable. It is uncontradicted that several years before September

---

**6.** Espinoza's 1981 complaint allegations are cognizable in this Court as admissions on his part, but are not binding or conclusive (*Enquip, Inc. v. Smith–McDonald Corp.*, 655 F.2d 115, 118 (7th Cir.1981)).

**7.** That claim bore an April 28, 1986 date of signature. Though the long time gap between signature date and filing date is puzzling, nothing hangs on it—the timeliness considerations are identical in any event.

1984 Espinoza knew (1) the nature of his injury (TMJ syndrome) and (2) its cause (the 1977 or 1979 operations, or both, plus perhaps the VA's postoperative treatment). Dr. Goldstein's records clearly show the diagnosis of TMJ syndrome (actually its equivalent, MFPD—see nn. 3 and 5) in 1980 —long before Dr. Klein's identical diagnosis in 1984. Indeed, the complaint in the 1981 action identifies injuries that track the elements of TMJ syndrome.[8] Not surprisingly, Espinoza does not really question at this point that he knew of his injury and its cause at least by 1981.

What Espinoza instead asserts to avoid the impact of Section 2401(b) is the "continuous treatment" doctrine, described this way in *Otto v. National Institute of Health*, 815 F.2d 985, 988 (4th Cir.1987):

> Nevertheless, as a number of cases have recognized, where there has been a course of continuous medical treatment, a claim may not accrue until the end of that course of treatment, if the treatment has been for the same illness or injury out of which the claim for medical malpractice arose.

Although the doctrine has never been adopted by our Court of Appeals, it has been applied under certain circumstances in a number of circuits (see, in addition to *Otto*, such cases as *Ulrich v. Veterans Administration Hospital*, 853 F.2d 1078, 1080–81 (2d Cir.1988); *Wehrman v. United States*, 830 F.2d 1480, 1483–86 (8th Cir. 1987)).

But no court has ever applied the doctrine blindly (as P.Mem. 3 would have this Court do), without consideration of its underlying rationales. Instead the cases have found two types of situations appropriate for application of the continuous-treatment concept (*Ulrich*, 853 F.2d at 1080–81):

1. where it may be unreasonable to expect a patient who is in the continuing care of a doctor to discover that the doctor's acts may be the cause of his injuries, due to concealment or the nature of the confidential relationship between doctor and patient; and

2. where it may be unreasonable to expect a patient to interrupt corrective treatment by a doctor or hospital by instituting suit against either while under their continuing care.

Even on the pro-Espinoza assumption that our Court of Appeals would accept and apply the doctrine, it would not come into play here. Its first rationale is plainly inapplicable, given Espinoza's unquestionable knowledge as manifested in his 1981 complaint. Nor does the second rationale ring true for at least two reasons:

1. Espinoza was not in fact receiving corrective treatment at the Hospital—indeed, he was receiving corrective treatment *elsewhere* for the alleged injury!

2. Espinoza can scarcely contend it was "unreasonable" to expect him to bring suit against the United States, given the fact that he did precisely that in 1981.

None of the post-*Kubrick* appellate cases applying the doctrine calls for such application here. *Ulrich* employed the second rationale to toll the statute during an intensive but brief three-month treatment at one hospital. *Wehrman*, 830 F.2d at 1485 applied it to a less intensive treatment over 22 years. Though the court noted that "merely intermittent" services were not continuous, the plaintiff in that case had continued to see doctors only at one hospital. Espinoza thus cannot rely on *Wehrman*, for he began seeing outside physicians back in 1980. *Otto* applied the doctrine even though plaintiff saw outside doctors, where he did so only at defendant's request and under defendant's supervision —again a wholly different situation from Espinoza's.

It is worth examining the reasons underpinning each of the two situations in which the notion of continuous treatment has been employed. As for the first, it is predicated on the idea of negating presumed discovery—an idea not in issue where (as

---

8. As already stated, the 1981 complaint alleged among other injuries "loss of feeling and movement in face and jaw and pain" and cited the United States, the Hospital and its agents as having caused those injuries.

here) *actual* knowledge exists.[9] As for the second, it appears to draw on the premise that a patient should not be forced to submit to treatment by someone at the same time the patient is forced (because of the running of limitations) to charge the same professional with malpractice. That too has no applicability here, where Espinoza was in fact going elsewhere for treatment. In short, Espinoza can give no good reason for permitting six years to elapse before filing his administrative claim—especially where the absence of such a claim was the specifically-identified reason for dismissal of the 1981 lawsuit.

One final point must be addressed. P.Mem. 2 argues that the 1981 complaint shows only that Espinoza suspected negligence in treatment prior to March 19, 1979 and is therefore inapplicable to the current action. That argument must fail for several reasons.

First, that is a false characterization of the 1981 complaint. Its Count II ¶¶ 6(e) and 7(e) and Count III ¶ 7 expressly alleged negligence in the course of the October 1979 second surgery, and Count II ¶¶ 6(c) and 7(c) charged negligent postoperative care. Second, *Kubrick* does not require knowledge of negligence—only of injury and causation. Finally, that argument is truly irrelevant as to the application of the continuous treatment doctrine, so it could not possibly serve to overcome the doctrine's inapplicability as to actions prior to September 2, 1984.

### Conclusion

What the Supreme Court said in *Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359 really applies a fortiori to Espinoza:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be un-

known or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

Here Espinoza was not ignorant of, but actually knew, his legal rights (he first filed suit in 1981); he was then "in possession of the critical facts that he has been hurt and who has inflicted the injury"; before that he not only *could* ask but *did* ask a "competent doctor" (Dr. Goldstein); and the best evidence that the doctor informed him of the United States' asserted negligence was Espinoza's filing of the earlier lawsuit itself. No legitimate basis exists for tolling the statutory timetable as to Espinoza.

Espinoza's administrative claim was far out of time under Section 2401(b). Because such a defect is jurisdictional in an action against the United States, this action is dismissed for lack of subject matter jurisdiction.

---

9. This opinion has continued to refer to what *Espinoza* knew. That might perhaps be questionable if the only evidence were Dr. Goldstein's notes (which do not show what he *told* Espinoza about his diagnosis). But it cannot be disputed in light of the 1981 complaint, for Espinoza is certainly charged with knowledge of his own allegations there.