85 N.Y.2d 733 (1995)
651 N.E.2d 1261
628 N.Y.S.2d 242
Sean Ganess, an Infant, by His Parents and Natural Guardians, Nelson Ganess et al., Appellant,
v.
City of New York et al., Respondents.
Court of Appeals of the State of New York.
Argued May 2, 1995
Decided June 7, 1995.
Pegalis & Wachsman, P. C., Great Neck (Gilbert Spencer, Steven E. Pegalis and Sanford S. Nagrotsky of counsel), for appellant.
Paul A. Crotty, Corporation Counsel of New York City (Elaine R. Rothenberg and Larry A. Sonnenshein of counsel), for respondents.
Chief Judge KAYE and Judges SIMONS, TITONE, BELLACOSA, SMITH, LEVINE and CIPARICK concur in Per Curiam opinion; Judge TITONE concurs in a separate concurring opinion.
*735 Per Curiam.
Plaintiff was born on August 6, 1973 at Elmhurst General Hospital, Queens County, with a medical condition known as Erb's palsy, which affects his left shoulder and arm. Beginning shortly after his birth, plaintiff visited doctors at the Hospital's Pediatric Neuromuscular Rehabilitation Clinic where his condition was monitored and his parents received instruction in a therapeutic program of home exercises.
At a meeting with his parents when plaintiff was 3½ years old, the doctors at Elmhurst explained that plaintiff's injuries were likely to be permanent. At that meeting, plaintiff's mother discussed with the doctors whether plaintiff's delivery by C-section might have prevented the condition.
On May 18, 1984, nearly 11 years after his birth, plaintiff filed a notice of claim against defendants alleging negligence by the medical personnel involved in his 1973 delivery.
Since a notice of claim in any medical malpractice action against defendants must be filed within 90 days after the claim arises (General Municipal Law § 50-e; McKinney's Uncons Laws of NY § 7401 [2] [New York City Health and Hospitals Corporation Act § 20 (2); L 1969, ch 1016, § 1, as amended]), and plaintiff indisputably failed to file such a notice until nearly 11 years after the alleged negligence, the only question before the Court is whether plaintiff can invoke the continuous treatment doctrine to excuse his delay (see, Matter of Daniel J. v New York City Health & Hosps. Corp., 77 N.Y.2d 630, 633).
Under the continuous treatment doctrine, the time in which a plaintiff must bring an action alleging malpractice is stayed "when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint" (Borgia v City of New York, 12 N.Y.2d 151, 155). As this Court has stated: "[t]he policy underlying the continuous treatment doctrine seeks to maintain the physician-patient relationship in the belief that the most efficacious medical care will be obtained when the attending physician remains on a case from onset to cure. * * * Implicit in the policy is the recognition that the doctor not only is in a position to identify and correct his or her malpractice, but is best placed to do so" (McDermott v Torre, 56 N.Y.2d 399, 408 [citations omitted]). Thus, it is "essential to the application of the doctrine * * * that there has been a *736 course of treatment established with respect to the condition that gives rise to the lawsuit. * * * [N]either the mere `continuing relation between physician and patient' nor `the continuing nature of a diagnosis' is sufficient" (Nykorchuck v Henriques, 78 N.Y.2d 255, 258 [citations omitted]).
Despite the trial court and Appellate Division writings in the present case, neither individuals suffering from chronic conditions, nor patients being "monitored" for a specific medical condition to ensure that it improves or at least does not deteriorate (as opposed to a general physical examination), are necessarily outside the doctrine (see, Richardson v Orentreich, 64 N.Y.2d 896, 899).
Here, however, plaintiff failed to show that the treatment rendered was continuous for the entire 11-year period now alleged. The last notation on plaintiff's medical chart is dated September 21, 1983. Plaintiff's primary physician treating the Erb's palsy, Dr. Beatrice Kaplan, testified that she last saw plaintiff in August 1983. Plaintiff's father, in an affidavit submitted in opposition to defendants' motion for summary judgment, claimed merely that he and his wife continued to take plaintiff to the hospital clinic "once a year" after 1983, yet provided no concrete information as to the dates of such visits or the treatment (if any) rendered. The conclusory assertion of the supposedly continuous nature of plaintiff's treatment was insufficient, as a matter of law, to rebut the documentary and testimonial evidence to the contrary and thus to establish plaintiff's entitlement to the doctrine (see, Curcio v Ippolito, 63 N.Y.2d 967).
Given the above, we need not and do not address a potentially intriguing idiosyncrasy of this case  namely, that the negligence was allegedly committed by an obstetrician at plaintiff's birth, whereas the ensuing 11 years of admittedly nonnegligent treatment were provided by an entirely different set of doctors with a different medical specialty (see, Pierre-Louis v Ching-Yuan Hwa, 182 AD2d 55, 57; Dundon v United States, 559 F Supp 469, 472; but see, Ulrich v Veterans Admin. Hosp., 853 F.2d 1078, 1080). Nor is there any claim that the infancy toll provisions of CPLR 208 read in accordance with General Municipal Law § 50-e (5) would serve to remedy the untimeliness problem here as plaintiff failed to file his notice of claim within 10 years, 90 days of the alleged malpractice (compare, LaBello v Albany Med. Ctr. Hosp., 85 N.Y.2d 701 [decided today], with Daniel J., supra).
*737 Accordingly, the order of the Appellate Division should be affirmed, with costs.
TITONE, J. (concurring).
I agree with the majority that plaintiff failed to establish that he was continuously treated by neuromuscular specialists affiliated with defendant Elmhurst General Hospital for the entire 11-year period in issue. I write separately only to emphasize my own serious questions as to whether the most fundamental requirement of the continuous-treatment doctrine  i.e., an unbroken course of treatment by a particular practitioner or closely affiliated group of practitioners  was satisfied here.
The Statute of Limitations on a medical malpractice claim is tolled when "there is continuous treatment for the same illness, injury or condition which gave rise to the * * * act, omission or failure [complained of]." (CPLR 214-a.) The policy underlying the doctrine "seeks to maintain the physician-patient relationship in the belief that the most efficacious medical care will be maintained when the attending physician remains on a case from onset to cure" (McDermott v Torre, 56 N.Y.2d 399, 408; see, Borgia v City of New York, 12 N.Y.2d 151).
This Court has repeatedly held that where the continuing treatment is provided by someone other than the practitioner alleged to have been negligent, there must be "`an agency or other relevant relationship'" between the two (Meath v Mishrick, 68 N.Y.2d 992, 994, quoting McDermott v Torre, supra, at 403; see, Florio v Cook, 48 N.Y.2d 792, affg 65 AD2d 548). Further, we have explicitly rejected the notion that the practitioners' common affiliation with a hospital is sufficient to constitute the requisite "relevant relationship" (Meath v Mishrick, supra; see also, Ruane v Niagara Falls Mem. Med. Ctr., 60 N.Y.2d 908). Finally, this Court has held that the necessary relationship is not established by a mere referral from the purportedly negligent practitioner to another practitioner who is to furnish ongoing treatment (Florio v Cook, supra; see also, Meath v Mishrick, supra, at 995 [overruling Fonda v Paulsen, 46 AD2d 540]).
These holdings demonstrate that the application of the "continuing treatment" toll to the present case is, at best, dubious. The alleged malpractice here was committed by practitioners affiliated with the obstetrical clinic operated by Elmhurst General Hospital. The "continuous treatment" on which plaintiff's claim for a statutory toll is predicated, however, is that provided by Dr. Kaplan and the entirely separate *738 pediatric neuromuscular clinic operated by Elmhurst. Accordingly, if the continuous-treatment doctrine is to be applied on these facts, plaintiff must be able to identify a nexus between the two clinics that could be deemed a "relevant relationship."
The fact that the two sets of practitioners are both affiliated with Elmhurst is clearly not a sufficient "relevant relationship" under the case law (see, Meath v Mishrick, supra). Further, the fact that the allegedly negligent obstetrical practitioners referred plaintiff to the neuromuscular clinic for ongoing treatment cannot establish the requisite relationship, because "no master-servant or principal-agent relationship" exists (Florio v Cook, 65 AD2d, at 548, supra). The only remaining reason for applying the continuous-treatment rule to these facts would be that both treating clinics were operated by the same umbrella entity, Elmhurst General Hospital  the entity that was named as a party defendant.
However superficially appealing this factor may be, it cannot be accepted uncritically as a basis for applying the continuous-treatment rule. First, treating the hospital as a unitary provider for purposes of the continuous-treatment doctrine is questionable because it could lead to circumvention of the Meath v Mishrick (supra) principle that the practitioners' common affiliation with a particular hospital cannot furnish the necessary continuity. Second, the approach is troubling because it would lead to the application of the continuous-treatment toll in cases where its purposes would not necessarily be advanced. A hospital may fairly be held liable for the negligent acts of its clinics under the traditional respondeat superior principles. However, a hospital is an impersonal entity that can provide medical care only in the abstract sense and is certainly not capable of forming the intimate one-on-one physician-patient relationship that the continuing-treatment doctrine was designed to protect (see, Nykorchuck v Henriques, 78 N.Y.2d 255, 258). Finally, permitting use of the continuous-treatment toll where the injured patient has been treated by separate clinics that happen to be operated by the same large medical institution would inevitably lead to differential treatment for those who rely on such institutions as their primary health-care providers and those who rely on private providers operating individually or in small, professionally homogenous groups.[*] Whether such differential treatment *739 is a sensible and legally acceptable outcome is a weighty question that requires considerably more thought and analysis.
Unfortunately, the posture in which this case has reached us prevents the Court from considering the legal viability of plaintiff's continuous-treatment-by-an-institution theory. The issue is outside of the Court's reviewing sphere for the simple reason that defendants have elected not to raise it. I would hope that, notwithstanding this inexplicable choice by these litigants, the Court's opinion in this case will not be read as an endorsement of plaintiff's continuous-treatment theory. Rather, the Court's decision should be read for what it is: a narrow determination that, even assuming the rule's theoretical applicability, the facts necessary to establish treatment during the entire relevant period were not sufficiently alleged. Because I agree with that narrow conclusion, I concur in both the rationale and the result.
Order affirmed, with costs.
NOTES
[*] Plaintiff's approach could also have implications for those who receive their health care through health maintenance organizations.