James E. DUNDON, Sr., as Administrator
of the Estate of James E. Dundon, Jr.,
James E. Dundon, Sr., individually, and
Mary E. Dundon, Plaintiffs,

v.

The UNITED STATES of America,
Defendant.

No. CV–80–2869.

United States District Court,
E.D. New York.

March 16, 1983.

As Amended March 18, 1983.

Henry M. Grubel, P.C., Freeport, N.Y., for plaintiffs.

Raymond J. Dearie U.S. Atty., E.D.N.Y. by Jo Davis, Reuben S. Koolyk, Asst. U.S. Attys., Brooklyn, N.Y., for defendant.

## DECISION AND ORDER

BRAMWELL, District Judge.

This is an action for medical malpractice and wrongful death brought in 1980 pursuant to the Federal Tort Claims Act. 28 U.S.C. 2674 (1976).[1] The court has jurisdiction under 28 U.S.C. § 1346(b) (1976).[2] Defendant, the United States of America, has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Under that rule this court may grant defendant's request for summary judgment in its favor only if it is determined that "there is no genuine issue as to any material fact", and that defendants are "entitled to a judgment as a matter of law". Fed.R. Civ.P. 56(c). In making the determination, any doubt as to the existence of a genuine issue of material fact must be resolved against defendant as the moving party. *Adickes v. Kress & Co.,* 398 U.S. 144, 157–159, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Furthermore, "On summary judgment the inferences to be drawn from underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

1. 28 U.S.C. § 2674 (1976) reads in pertinent part as follows:
   The United States shall be liable respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...

2. 28 U.S.C. § 1346(b) (1976) reads in pertinent part as follows:

## BACKGROUND

The decedent, James Edward Dundon, Jr., was born on December 15, 1946. In October of 1967 he enlisted in the Army. He was on active duty in Vietnam for a year, and was awarded silver and bronze stars. Near the end of his tour of duty, the decedent began to suffer from severe depression and headaches. In July of 1970, two days prior to his scheduled return to the United States from Vietnam, the decedent stabbed himself repeatedly in the abdomen and slashed both his wrists. He received treatment for his self-inflicted wounds at military hospitals abroad and in the United States.

The decedent's headaches, vomiting and depression continued to plague him following his recovery from the suicide attempt. In the fall months of 1970 until his discharge from military service in December of 1970, the decedent received psychiatric care including electroconvulsive therapy in Veterans Administration hospitals in Pennsylvania and New York. During these treatments the decedent apparently did not receive a neurological examination and workup.

In 1974, the decedent was admitted to the V.A. hospital in Montrose, New York on two separate occasions and was an inpatient from September 6, 1974 through January 6, 1975. Again, he was diagnosed as suffering from severe psychiatric illness and electroconvulsive therapy was administered on numerous occasions. A neurological examination and workup was not performed during the course of this treatment.

In the spring of 1975, the decedent was an inpatient on two further occasions, at the V.A. hospital in Brooklyn, New York. The government physicians continued to treat his disability as stemming from func-

... [T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... or personal injury or death covered by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment...

tional (i.e., nonorganic) psychiatric problems, and administered additional electroconvulsive therapy. Again, a neurological examination and workup was not performed.

In early July of 1975, the decedent was admitted to the Brooklyn V.A. hospital for a third time. During this treatment, he was for the first time transferred to the neurology service, and diagnostic procedures were performed to determine if there was an organic rather than psychiatric cause for his symptoms. It soon became clear that the decedent had a brain tumor or lesion, and he and his parents were informed of that fact on or about August 18, 1975. Diagnostic testing to determine the precise location, identity, and stage of development of the brain lesion continued until October of 1975, at which time the decedent was transferred to the V.A. hospital in New York (Manhattan) to be operated upon by neurosurgeons.

In October and November of 1975 the New York V.A. physician performed "shunt" operations to relieve the increased intercranial pressure caused as a result of the lesion. During the course of these operations, however, the tumor exploded and a craniotomy was performed to remove tumor contents from the brain. The tumor contents then spilled into the decedent's spinal fluid. The decedent never recovered from these operations; he lapsed into a coma in January of 1976, and died on September 30, 1977 at the age of thirty.

On January 18, 1979 plaintiffs filed an administrative claim pursuant to the Federal Tort Claims Act. 28 U.S.C. 2675(a) (Supp.1982).[3] The claim was subsequently denied by the Veterans Administration district counsel by letter dated May 20, 1980. On October 16, 1980 plaintiffs filed suit, alleging medical malpractice and wrongful death. In their Second Answer to Defendant's Interrogatories, plaintiffs allege both misdiagnosis and negligence in performing

the surgery as elements of their cause of action.

The government contends in this motion that plaintiffs' entire action is barred by the time limitations set forth in 28 U.S.C. § 2401 (Supp.1982). Further, the government asserts that the claim of medical malpractice in surgery is prohibited, regardless of the court's statute of limitations decision, due to plaintiffs' alleged failure to raise that issue in their administrative claim under section 2675(a).

ACCRUAL OF THE CLAIM

It is well established that the United States is immune from suit unless it has consented to be sued. *United States v. Kubrick*, 444 U.S. 111, 117–18, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979); *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957); *United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). The Supreme Court has also recognized that Congress may impose such terms and conditions on a waiver of this sovereign immunity as it deems appropriate. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *Honda v. Clark*, 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1961). The Federal Tort Claims Act creates a right of recovery against the United States but places limitations on the possible claims. Specifically, it provides in pertinent part that:

> A tort claim against the United States shall be forever barred unless presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months ... of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b) (Supp.1982).

In determining when a cause of action accrues, federal law rather than state law governs. *Lavellee v. Listi*, 611 F.2d 1129, 1130 (5th Cir.1980); *Ciccarone v. Unit-*

---

**3.** 28 U.S.C. § 2675 (Supp.1982) states in pertinent part as follows:

> An action shall not be instituted upon a claim against the United States ... unless the

claimant shall have first presented the claim to the appropriate Federal Agency and his claim shall have been finally denied by the agency in writing...

ed States, 486 F.2d 253, 256 (3d Cir.1973), Kossick v. United States, 330 F.2d 933, 935 (2d Cir.), cert. denied, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964). The Supreme Court recently held that under the Federal Tort Claims Act, a tort claim accrues when the claimant has discovered, or in the exercise of reasonable diligence, should have discovered, the existence, permanence and physical cause of the injury, whether or not he has reason to believe that he has an actionable claim. United States v. Kubrick, supra, 444 U.S. at 124, 100 S.Ct. at 360. Both the government and plaintiffs recognize that Kubrick sets forth the standard applicable to this action. Each party also agrees that the critical inquiry is whether a plaintiff is "armed with facts" sufficient to alert him that a basis for investigating the possibility of malpractice exists. Id. at 123–24, 100 S.Ct. at 360.

Although the parties both recognize the controlling standard, they are in sharp disagreement as to its proper application to the facts of this tragic case. The government asserts that plaintiffs were "armed with facts" about the harm done to the decedent by August 18, 1975, the date that diagnosis of an organic neurological disorder was communicated to the decedent and his parents. Plaintiffs argue that until such time as it was determined precisely what type of tumor decedent had, the location of that tumor in the brain, and the stage of its development, it was impossible to know whether and to what extent any harm was done to the decedent. Plaintiffs conclude, therefore, that the claim did not accrue until September 30, 1977, the date of the decedent's death, and that the administrative claim filed some fifteen months later on January 18, 1979 was filed in a timely manner.

Accepting plaintiffs' recital of the facts as true, by August 18, 1975 the decedent and his parents were informed that he was in fact suffering from an organic neurological disorder. The question here is whether this information was sufficient to suggest malpractice to the decedent and his family. The government claims it was. It argues that plaintiffs were armed with the knowl-

edge that decedent had undergone five years of severe headaches, psychological strain and lengthy hospitalizations with drug and electroshock treatments, and had received nothing to treat his organic neurological disorder because V.A. physicians had failed to diagnose the lesion which was the cause of his problems.

Material fact issues remain concerning when decedent had a reasonable opportunity to discover all the elements of a possible malpractice action. Accordingly, the question of when the statute of limitations commenced to run can only be answered after a plenary disposition on the merits. There can be no doubt, however, even accepting the government's assertions in their most favorable light, that August 18, 1975 was the earliest date decedent did, or reasonably should have, become aware of facts which would have armed him with awareness of the existence, permanence and physical cause of his suffering. For the purpose of this summary judgment motion, then, the date of accrual is fixed as August 18, 1975.

## TOLLING OF THE STATUTE OF LIMITATIONS

### CONTINUOUS TREATMENT

Plaintiffs contend that the Tort Claims Act time limitation provision was tolled by reason of New York's "continuous treatment" doctrine. It is federal law, however, that governs the application of the doctrine to actions based on the Federal Tort Claims Act. Kossick v. United States, supra, at 935. Although the doctrine has been mentioned by federal courts, this court has not found it applied in any federal law holding. The cases "... typically assume its existence and find it inapplicable on the facts." Kelly v. United States, 554 F.Supp. 1001 (E.D.N.Y.1983). Here again the court finds the doctrine inapplicable on the facts.

The theory offered to support the application of the doctrine to this matter, is that "it would be absurd to require a wronged patient to interrupt corrective efforts" by serving the United States Attorney with a summons. Kossick v. United States, supra, at 936 (quoting Borgia v. City of New York,

12 N.Y.2d 151, 156, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962)). The *Borgia* court, in developing the continuous treatment doctrine, held that when a physician continues to treat the patient for the same condition which gave rise to the alleged malpractice, the statute of limitations does not begin to run until the termination of the physician-patient relationship. 12 N.Y.2d at 157. Under this theory, then, the doctrine could apply to a patient-plaintiff with knowledge of the effects, and even the negligence, of the doctor's act. At least one court has expressly disapproved of this rationale as being violative of congressional intent to induce prospective plaintiffs to investigate possible claims promptly, and to sue before evidence becomes stale and memories fade. *Tyminski v. United States,* 481 F.2d 257, 264 n. 5 (3d Cir.1973).

In any event, the doctrine presupposes more continuity of treatment than occurred here. Although the decedent was treated intermittently by Veterans Administration personnel from 1970 until his death in 1977, the treatments were administered by a series of different physicians in different departments of different V.A. hospitals. In 1970, the decedent was treated in V.A. hospitals located in Pennsylvania and New York. In 1974, the decedent was admitted on two occasions to the V.A. hospital in Montrose, New York, where he received psychiatric treatment. In 1975, the decedent was an inpatient on two further occasions, this time at the Brooklyn, New York V.A. hospital, where he was treated by different doctors. When the decedent was readmitted to the Brooklyn V.A. hospital again in the spring of 1975, he was, for the first time, evaluated neurologically, and it was neurologists who discovered the tumor. Finally, in October of 1975, he was again transferred to a different hospital, the Manhattan V.A. Medical Center, and placed under the care of new physicians—who subse-

quently performed the "shunt" and craniotomy operations.

Plaintiffs would argue, however, that these transfers were recommended, and in one instance insisted upon, by V.A. physicians. Plaintiffs state that the V.A. physicians relied on charts and diagnoses made by prior V.A. treating physicians, and that the transfer of the decedent from one facility to another, and thereby one V.A. physician to another, should not preclude application of the continuous treatment doctrine. The court does not agree. The contention that it is sufficient that the decedent continued to receive treatment at facilities owned and operated by the government and was continuously treated by government physicians has been consistently rejected by the courts where a patient receives improper care from one government physician and is thereafter treated by others not accused of that malpractice. *See e.g., Camire v. United States,* 535 F.2d 749, 750 (2d Cir. 1976); *DeGirolamo v. United States,* 518 F.Supp. 778, 781 (E.D.N.Y.1981). Plaintiffs do not allege that the decedent was treated after November of 1975 by any of the physicians claimed to be responsible for the misdiagnosis and failure to recognize the organic nature of his problem. Thus, the fact that decedent remained under the care of different physicians employed by the United States did not in and of itself prevent him from diligently seeking advice concerning his injury or legal rights. Therefore, application of the continuous treatment doctrine is inappropriate in this case.[4] Although the plaintiffs fail to persuade this court to toll the statute of limitations through application of the continuous treatment doctrine, it nevertheless finds the action timely on an alternative basis.

## DECEDENT'S COMATOSE CONDITION

■ While there is no doubt that decedent would not have jeopardized his care by

---

**4.** The other theory often offered to support application of the continuous treatment doctrine is that a patient cannot be expected to discover the cause of his injuries while under the care of a negligent doctor because the doctor might not reveal to the patient information necessary to the patient's understanding of his problem. *See Ashley v. United States,* 413

F.2d 490 (9th Cir.1969). Such logic, however, is inapplicable to this case. Here, the decedent and his parents were directly and clearly informed of the presence of a tumor on or about August 18, 1975. That information was sufficient to alert decedent to the fact that the treatments of the previous four years may have been based on negligent misdiagnosis.

diligently seeking legal advice at any time following the August 18, 1975 date of accrual designated above, it would strain logic and reason to suggest that he could have, in fact, done so had he wished. Shortly after the "shunt" operations were performed in November of 1975, the decedent lapsed into a coma from which he never recovered. During the comatose period, the decedent clearly was incapable of comprehending the elements of possible malpractice or of pursuing a remedy for the injuries sustained. More significantly, the very tort that allegedly forms the basis of this suit caused that incapacity. The effect of the operations was to take away the decedent's mental functions entirely.

The government quite correctly asserts that disability due to mental incompetency does not toll the running of the statute of limitations provision of section 2401(b). *Casias v. United States,* 532 F.2d 1339, 1342 (10th Cir.1976), citing *Accardi v. United States,* 435 F.2d 1239 (3d Cir.1970); *Williams v. United States,* 228 F.2d 129 (4th Cir.1944), *cert. denied,* 351 U.S. 986, 76 S.Ct. 1054, 100 L.Ed. 1499, *reh'g denied,* 352 U.S. 860, 77 S.Ct. 26, 1 L.Ed.2d 71 (1956). The government reasons that sections 2401(a) [5] and 2401(b) [6] are mutually exclusive provisions, and that subsection (a) applies to all suits against the government except a tort claim. It is argued that section 2401(b) regarding tort claims, must be strictly construed since the United States generally enjoys immunity. Noting that there is a tolling provision for disabilities in section 2401(a) but that no such express provision appears in section 2401(b), the government concludes that decedent's disability of mental incapacity is one for which the statute of limitations of section 2401(b) could not be

tolled. The court disagrees. To treat this case as one involving mere mental incompetency in the general sense proffered by the government is to lose sight of the decedent's extraordinary situation. The decedent's mental condition, allegedly caused by his treating physicians, directly prevented his understanding the nature and cause of his injuries.

In *Zeidler v. United States,* 601 F.2d 527 (10th Cir.1979), the Tenth Circuit faced a similarly unusual factual situation involving a malpractice tort claim by a former V.A. patient who had received two lobotomy operations. The operations were performed in 1947 and 1948, and a conservator, appointed for Mr. Zeidler in 1975, brought suit on his behalf in 1976. The claim on appeal was that the lobotomy operations' effect was to take away Mr. Zeidler's mental function. The Tenth Circuit, speaking through Judge William E. Doyle, reversed the district court's decision that had held that the statute of limitations had run. In remanding the case for full factual determination concerning when the claim accrued, the court stated:

> We do not consider the insanity rule discussed in *Casias* to be applicable to the present case... We say also that *brain damage or destruction is not to be classified in the same way as ordinary mental disease or insanity for the purpose of barring such an action; that the incapability of the plaintiff to comprehend the elements of possible malpractice, if such existed or exists, should not bar the plaintiff from ever pursuing a remedy for violation of his rights.* (emphasis supplied)

*Zeidler v. United States, supra,* at 531.

The distinction drawn in *Zeidler* providing a narrow exception that tolls the stat-

---

**5.** 28 U.S.C. § 2401(a) (Supp.1982) states in pertinent part as follows:

> ... [E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

**6.** 28 U.S.C. § 2401(b) (Supp.1982) states in pertinent part as follows:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing ... of notice of final denial of the claim by the agency to which it was presented.

ute of limitations is not without its critics, *e.g., Zeidler v. United States, supra,* at 532–33 (Logan, J. dissenting). However, this court finds the logic of the majority's opinion convincing. As this is an issue of first impression in the Second Circuit, careful consideration has been given to all the countervailing arguments. The exception developed, however, does not, in this court's opinion, contravene the purposes or principles of the limitations provision section 2401(b). Nor does the distinction improperly broaden the United States' vulnerability to suit in disregard of congressional mandate and judicial precedent. The exception is narrow and merely prevents "blameless ignorance" from being penalized, by avoiding the anomalous result of having an arguably wronged comatose patient denied his right to press a claim by virtue of the very malpractice of which he seeks to complain.

It had been argued that a guardian or conservator could have brought suit to look out for the decedent's interest here. This contention has no basis in law. At all times during his treatment, the decedent was of the age of majority and had not been legally declared incompetent. Since there exists no evidence that there was a formal appointment of a guardian or conservator, only upon decedent's death could suit be brought by another to protect his interests. In fact, this is exactly what occurred. The decedent died on September 30, 1977 and his parents presented an administrative claim on his behalf some fifteen months thereafter—well within the two year limitations provision of section 2401(b).

It is the court's opinion, therefore, that the statute of limitations was tolled during the period the decedent lay comatose, a period of some twenty months from January of 1976 to September 30, 1977. Having decided earlier that the claim accrued on or about August 18, 1975 when the decedent was informed of the presence of an organic brain lesion, we have the following situation: the statute ran for approximately five months prior to decedent's lapse into a coma, was tolled for the following twenty months while decedent was in a coma, and commenced running once again on Septem-ber 30, 1977, continuing for some sixteen months until plaintiffs filed their claim on January 18, 1979. Therefore, a total of approximately twenty-one months elapsed prior to plaintiffs' filing suit. For the foregoing reasons, plaintiffs' action pursuant to the Federal Tort Claims Act was timely filed under section 2401(b).

## WRONGFUL DEATH CLAIM

■ Because plaintiffs' action under the Federal Tort Claims Act is timely, their wrongful death claim is also properly before the court. Although federal law determines when the tort claim limitations period begins to run under section 2401(b), *Toal v. United States,* 438 F.2d 222, 224 n. 3 (2d Cir.1971); *Kossick v. United States, supra* at 935, state law governs for the purpose of determining whether an actionable wrong exists, *e.g., Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); *Quinton v. United States,* 304 F.2d 234, 238 (5th Cir.1962). The Federal Tort Claims Act explicitly states that the liability of the United States is determined by applying the law of the place where the negligent act or omission occurred. The Act states in pertinent part:

> ·... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (1976).

■ Since decedent's treatment was administered in New York, this court must apply New York State law to determine whether plaintiffs have an actionable wrongful death claim. Specifically section 5–4.1 of the New York Estates Powers and Trusts Law provides that a personal representative of a decedent may maintain a wrongful death action provided the defendant "would have been liable to the decedent by reason of such wrongful conduct if death had not ensued". The New York Court of Appeals construes this language to mean that no action may be maintained by the representative unless the decedent, at the

time of his death, could have maintained the action for the underlying tort. *Prink v. Rockefeller Center, Inc.,* 48 N.Y.2d 309, 315–16, 422 N.Y.S.2d 911, 398 N.E.2d 517 (1979); *Johnson v. Stomberg-Carlson Tel. Mfg. Co.,* 276 N.Y. 621, 622, 12 N.E.2d 607 (1938). Here, for reasons earlier stated, the running of the statute of limitations was tolled by virtue of the decedent's comatose condition, and the decedent would have retained his ability to file a claim in January of 1979 had he recovered from his coma. Moreover, the predicate tort claim underlying the wrongful death claim was timely filed—that is within two years of decedent's death. Therefore, the wrongful death claim also falls within the statutory limitations of the Federal Tort Claims Act.

## THE SCOPE OF THE ADMINISTRATIVE CLAIM

■ Having reached the conclusion that plaintiffs' entire cause of action is timely, it is necessary to address the government's assertion that the claim of medical malpractice during the performance of "shunt" operations is barred by plaintiffs' alleged failure to present such a claim at the administrative level. Section 2675(a) of the Federal Tort Claims Act provides in pertinent part that:

An action shall not be instituted upon a claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate Federal Agency and his claim shall have been finally denied by the agency in writing

. . .

*See Three M Enterprise, Inc. v. United States,* 548 F.2d 293 (10th Cir.1977); *Childers v. United States,* 442 F.2d 1299 (5th Cir.1971); *Franklin State Bank v. United States,* 423 F.Supp. 1 (S.D.N.Y.1975). A plaintiff, therefore, may not present one claim to the agency and then maintain suit on the basis of a different set of facts. These requirements are not intended to place needless obstacles in the path of deserving claimants, but to facilitate administrative investigation of tort claims and prelitigation settlement. *Executive Jet Aviation, Inc. v. United States,* 507 F.2d 508, 515 (6th Cir.1974).

The government contends that plaintiffs alleged merely misdiagnosis "and gave no hint whatsoever that they had any complaint regarding the surgery later performed on the decedent". Defendant's Memorandum of Law in support of its motion for summary judgement, pp. 23–24. This assertion is unsupported by the record. As set forth below, it is clear that the Veterans Administration was put on notice that plaintiffs' claim was based upon failure to properly diagnose and *treat* decedent from the time he first entered a V.A. hospital until his death.

On January 18, 1979, plaintiffs filed an administrative tort claim pursuant to the Federal Tort Claims Act. On the Standard Form 95 in the space entitled "Description of the accident" plaintiffs wrote:

Prior to discharge from the army 12/2/70 and thereafter, the deceased presented with behavior classical for an intercranial lesion but the V.A. failed to diagnose a brain tumor until or about 8/18/75. They kept treating him for a psychiatric disorder; by the time they finally worked him up for a brain tumor, five years had elapsed from when it should have been diagnosed until the time it was diagnosed.

In the space designated "State nature and extent of injury which forms the basis of this claim" plaintiffs wrote:

The deceased was treated for a psychiatric disorder with drugs and electroshock treatment when he had a brain tumor all the time. *In or about 11/75, he was finally operated on; as a result of his treatment he remained in the New York V.A. Hospital in critical condition from 10/75 till his death in September of 1977.* (emphasis supplied).

Plaintiffs' claim, though largely directed at the V.A. physicians' alleged negligent misdiagnosis and failure to treat decedent, explicitly refers to a work-up for a brain tumor and an operation. Further, the claim explicitly states *in the same sentence discussing the operation* that *"as a result of his treatment"* (emphasis supplied) decedent remained in critical condition until his death in September of 1977.

The court's conclusion is further supported strongly by the language of the Veterans Administration district counsel's letter to plaintiffs denying their claim. In that letter, the V.A. counsel states in pertinent part:

A review of all of the facts and circumstances associated with this case does not reveal any negligence or wrongful act on the part of any employee of the V.A. Medical Center, *New York, NY,* Brooklyn, NY or Montrose, N.Y. (emphasis supplied)

There can be no doubt, therefore, that the Notice of Claim submitted by plaintiffs to the Veterans Administration was sufficiently clear in purpose and scope to alert the agency as to the nature of plaintiffs' allegations. It strains reason to suggest that, in light of the facts of this case, the government was not aware that a malpractice in surgery claim against the Manhattan, V.A. was an element of the overall claim of medical malpractice. A valid claim need do no more than provide sufficient information as to allow an agency to process a claim administratively. Here the V.A., through its district counsel, reviewed "all the facts and circumstances associated with this case" and concluded that there was no basis for plaintiffs' claim. *See* Letter of district counsel dated May 20, 1980. Yet now the government does a full about-face and claims it was unaware of the malpractice in surgery claim. The available evidence persuasively refutes this contention. It is clear that the government did not believe the action was timely filed. This court today holds to the contrary, and in doing so does not believe that the purposes of the administrative procedures set forth in the Federal Tort Claims Act are frustrated by inclusion of the malpractice in surgery claim. The government's unreasonably narrow construction of the exhaustion requirement and of the requirements for filing of properly informative administrative claims cannot be permitted to obstruct what may well be a viable claim by plaintiffs.

CONCLUSION

For the foregoing reasons, the court finds plaintiffs' claim is timely under section 2401(b) of the Federal Tort Claims Act. Because this is so, the wrongful death action also falls within the applicable time limitations provision. Having found that the action was timely, the court then rejects defendant's argument for exclusion of the claim relating to malpractice in surgery. Upon the evidence before the court, the malpractice in surgery claim is a valid element of plaintiffs' cause of action.

The court does not hold today that plaintiffs are entitled to recover, but merely that this is not a case for final disposition based on the pleadings. The case cannot be terminated on summary judgment as a matter of law and should be tried in accordance with the Federal Tort Claims Act and decided on its merits.

Accordingly, defendant's motion for summary judgment is hereby DENIED in all respects, and defendant's motion to dismiss the malpractice in surgery claim is also DENIED.

IT IS SO ORDERED.