# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1375

_____

| | |
|---|---|
| Steven McCoy, | * |
| | * |
| Plaintiff - Appellant, | * |
| | *   Appeal from the United States |
| v. | *   District Court for the |
| | *   Western District of Missouri |
| United States of America, | * |
| | * |
| Defendant - Appellee. | * |

_____

Submitted: November 13, 2000

Filed: August 31, 2001

_____

Before McMILLIAN, RICHARD S. ARNOLD, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Steven McCoy appeals from the grant of summary judgment to the government on his claim pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2672. We affirm.

I

McCoy was convicted of drug conspiracy charges and incarcerated in various federal penal facilities from 1993 to April 16, 1999. Sometime in 1994, he was bitten

on the right leg by a spider and he sought treatment at the infirmary. Several attempts to treat the infection failed. Eventually, doctors diagnosed peripheral vascular disease and attempted an arterial bypass. When this too failed, McCoy's right leg was amputated in 1995.

In June 1996, McCoy noticed lesions on the heel of his left foot. He again sought treatment, and again the treatment was unsuccessful. McCoy was transferred to several different medical facilities, and received treatment from several different doctors. While one doctor had recommended that he be evaluated for vascular disease, he did not receive treatment for vascular disease in the left leg until January 1997. A vascular bypass and other attempts to clear the artery failed. He developed gangrene in his left foot. On January 23, 1997, doctors at the United States Medical Center for federal prisoners in Springfield, Missouri amputated his left leg below the knee.

Subsequent to the amputation, the stump wound on McCoy's left leg did not heal. He underwent several more surgeries to close the wound, to attempt skin grafts, for a stump revision and for a bone resection. In March 1997, his doctors first began to suspect Buerger's disease;[1] however, they did not inform him of this suspicion until April 1997. He was not advised to quit smoking, which is the only known effective treatment for Buerger's disease. He continued to receive treatment for complications from the amputation until his release from the federal system in April 1999.

---

[1]Buerger's disease is an inflammation of the arteries, veins and nerves, primarily in the legs, causing restricted blood flow. It occurs primarily in younger men (ages 20-40) who are heavy smokers. There is no known cure. Abstinence from tobacco use is the only known method of arresting the disease. If untreated, Buerger's disease can lead to gangrene in the affected limb, which will necessitate removal of the limb. See The Gale Encyclopedia of Medicine 547-48 (Donna Olendorf et al. eds., 1999).

On February 1, 1999, McCoy filed an administrative claim with the Bureau of Prisons (BOP). He alleged malpractice which resulted in the amputation of his left leg.[2] McCoy's claim also states that "[s]ince that time he has suffered from repeated open sores in the stumps of both legs and he has undergone several procedures for debridement and revision of open areas on his stumps." The BOP rejected the claim as untimely, since the amputation occurred more than two years before McCoy filed his claim.

McCoy filed suit in federal district court on August 5, 1999, alleging negligent failure to diagnose and treat vascular disease resulting in the amputation of his left leg, past and ongoing pain and suffering, medical bills, permanent disability, loss of future wages, and loss of enjoyment of life. The government filed a motion for summary judgment, asserting that his claim was time-barred since he had filed his administrative claim more than two years after the amputation. McCoy argued that the "continuing treatment" doctrine tolled the limitations period. The district court originally accepted McCoy's argument, but later granted the government's motion for reconsideration and entered summary judgment for the government. McCoy now appeals the sole issue of whether the statute of limitations bars his action.

II

An action may not be commenced in federal court under the FTCA unless the plaintiff has first presented his claim to the appropriate federal agency, and that claim has been denied. See 28 U.S.C. § 2675(a). Further, "[a] tort claim against the United

---

[2]McCoy had previously filed a claim alleging malpractice associated with the treatment and eventual amputation of his *right* leg. That claim was also denied. McCoy subsequently filed suit in the United States District Court for the Middle District of Pennsylvania (Case Number 97-CV-1099), but his suit was dismissed. That dismissal is not the subject of this lawsuit.

States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues. . . ." 28 U.S.C. § 2401(b). A plaintiff's compliance with the two-year limitations period is a jurisdictional prerequisite, since the FTCA acts as a waiver of the federal government's sovereign immunity. See Walker v. United States, 176 F.3d 437, 438 (8th Cir. 1999).

The Supreme Court has held that an FTCA claim for medical malpractice accrues when a plaintiff becomes aware of his injury and its probable cause. United States v. Kubrick, 444 U.S. 111, 122 (1979). The district court found that McCoy's claim was barred by the statute of limitations in § 2401(b) because McCoy knew of the government's "breach of duty" as soon as his leg was amputated. The district court also determined that McCoy's claim of continuing treatment had "nothing to do with the claim." It is undisputed that McCoy filed his administrative claim more than two years after the amputation of his left leg.

McCoy argues that his claim is not time-barred. He argues that his administrative claim alleged more than mere negligence in the amputation of his leg, and included a claim of negligence in failing to diagnose and treat his Buerger's disease. Because the entire course of diagnosis and treatment including the post-amputation treatment of the stump wounds was negligent, he argues that the "continuous treatment" doctrine tolls the statute of limitations during that period. As a matter of policy, McCoy asserts that he should not have to file a claim against his doctors while he is being continuously treated by those same doctors.

The government asserts that McCoy's claim did not allege malpractice in the diagnosis and treatment of Buerger's disease, but only malpractice resulting in the loss of his leg, and that he is bound by the claims made in his administrative claim. Negligent treatment of his vascular disease thus cannot be raised in federal court, because McCoy did not raise it in his administrative claim and therefore did not exhaust his administrative remedies with regard to that claim. The government further argues

-4-

that since McCoy did not allege continuing negligent treatment in his administrative claim, the continuous treatment doctrine will not apply. Because the date his leg was amputated was a date certain, and because there could be no continuing "treatment" to correct the error resulting in the loss of his leg, he was therefore required to file his administrative claim within two years of the amputation.

The continuous (or continuing) treatment doctrine will, in certain cases, toll the statute of limitations during the course of treatment. There are two variations of the continuing treatment doctrine in use in the circuits. We have previously examined both. See Wehrman v. United States, 830 F.2d 1480 (8th Cir. 1987); Reilly v. United States, 513 F.2d 147 (8th Cir. 1975).

In Wehrman, we described the doctrine as follows: "Under the continuing treatment doctrine, a plaintiff's cause of action does not accrue until the tortious continuing treatment ends, even if the plaintiff is aware of the facts constituting negligence before that time." Id. at 1483. The panel specifically noted that "'where the tortious conduct is of a continuous nature, the Kubrick rule does not apply.'" Id. at 1485 (quoting Gross v. United States, 676 F.2d 295, 300 (8th Cir. 1982)). Wehrman provides no assistance to McCoy because he failed to raise an issue of continuing *negligent* treatment in his administrative claim.[3] A litigant may not base any part of his tort action against the United States on claims that were not first presented to the proper administrative agency. See Provancial v. United States, 454 F.2d 72, 74-75 (8th Cir. 1972). Because McCoy did not plead continuous negligent treatment, he has not tolled the statute under the Wehrman rule.

---

[3] The district court determined that McCoy's administrative claim cannot be fairly read to encompass his failure to diagnose and treat claim. We do not find this determination to be clearly erroneous. See Walker, 176 F.3d at 438.

A different version of the continuing treatment doctrine has been adopted in other circuits, although not in ours. These circuits do not require that the entire course of treatment be negligent, but only that some portion of the ongoing treatment be negligent. The statute of limitations may be tolled during subsequent continuing treatment, even if non-negligent. See, e.g., Otto v. Nat'l Inst. of Health, 815 F.2d 985, 988 (4th Cir. 1987) ("[W]here there has been a course of continuous medical treatment, a claim may not accrue until the end of that course of treatment, if the treatment has been for the same illness or injury out of which the claim for medical malpractice arose.") This version of the doctrine permits a wronged patient to benefit from his physician's corrective efforts without the disruption of a malpractice action. Id.; see also Ulrich v. Veterans Admin. Hosp., 853 F.2d 1078, 1080-81 (2nd Cir. 1988) (discussing rationales for continuous treatment doctrine). These circuits do not limit the continuous treatment doctrine to continuously *negligent* treatment.

We have rejected the form of the doctrine discussed in Otto. We have held that the continuing treatment doctrine does not toll the statute of limitations until treatment is complete if "the claimant is aware of the acts constituting negligence." Reilly, 513 F.2d at 150. In this case, the district court determined that McCoy knew of his doctors' breach of duty "as soon as the leg was amputated." We cannot say that this determination is clearly erroneous. See Walker, 175 F.3d at 438. Therefore, as in Reilly, "[t]he fact that the appellant continued to receive treatment for her condition well into the two-year period prior to the filing of [his] administrative claim does not change the result here." Id.

III

Because McCoy is unable to toll the limitations period, his untimely claim did not effectuate a waiver of the government's sovereign immunity. For this reason, we affirm the decision of the district court.

-6-

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. I think that there are two versions of the continuing treatment doctrine, one which postpones the accrual of the cause of action and a second which tolls the running of the statute of limitations. Because the district court concluded-- mistakenly, in my view, as I explain below-- that McCoy did not raise a claim of continuing negligence, the following discussion is necessarily speculative.

TWO VERSIONS

First, continuing treatment may postpone the accrual of a cause of action. Ordinarily, "[a]n FTCA action accrues when the plaintiff in the exercise of reasonable diligence knows both the existence and the cause of his [or her] injury." Ulrich v. United States, 853 F.2d 1078, (2d Cir. 1988), citing United States v. Kubrick, 444 U.S. 111, 122-25 (1979) (rejecting argument that FTCA claim does not accrue until plaintiff knows that acts inflicting injury may constitute negligence). However, as noted by the majority opinion, "[u]nder the continuing treatment doctrine, a plaintiff's cause of action does not accrue until the tortious continuing treatment ends, even if the plaintiff is aware of the facts constituting negligence before that time." Slip op. at 5, citing Wehrman v. United States, 830 F.2d 1480, 1483 (8th Cir. 1987). "Since usually no single incident in a continuous chain of tortious activity can 'fairly or realistically be identified as the cause of significant harm,' it seems proper to regard the cumulative effect of the conduct as actionable." Page v. United States, 729 F.2d 818, 821-22 (D.C. Cir. 1984), citing Fowkes v. Pennsylvania R.R., 264 F.2d 397, 399 (3d Cir. 1959). As noted by the majority opinion, this circuit has rejected the argument that Kubrick overruled the continuing treatment doctrine, slip op. at 5, citing Wehrman, 830 F.2d at 1486, and has held that "where the tortious conduct is of a continuing nature, the Kubrick rule does not apply." Id., citing Gross v. United States, 676 F.2d 295, 300 (8th Cir. 1982).

Second, continuing treatment may toll the running of the statute of limitations. "[W]here the plaintiff is in the continuing care of the negligent actor for the same injury out of which the FTCA cause of action arose, the statute of limitations may be tolled under certain circumstances until the end of the course of treatment." Ulrich, 853 F.2d at 1080 (explaining two rationales that support the continuing treatment doctrine are, first, that it is not reasonable to expect a patient who is in the continuing care of a doctor to discover that the doctor's acts may be the cause of his or her injury and, second, that it is not reasonable to expect a patient being treated by a doctor or hospital to interrupt corrective treatment by instituting suit against either while under their continuing care).

Here, McCoy argued that his claim was not based on a single incident of negligent conduct. Rather, as noted by the majority opinion, he argued that the entire course of diagnosis and treatment of his peripheral vascular disease, or Buerger's disease, including the amputation and post-amputation treatment, was negligent. Slip op. at 4.

ADMINISTRATIVE CLAIM

The majority opinion concluded that McCoy did not raise an issue of continuing negligent treatment in his administrative claim and therefore could not rely on the continuing treatment doctrine later in court. Id. at 5 (FTCA litigant must raise claim first in administrative claim). I disagree. "A valid claim need do no more than provide sufficient information as to allow an agency to process a claim administratively." Dundon v. United States, 559 F. Supp. 469, 477 (E.D.N.Y. 1983). My reading of the record does not support the district court's determination that the administrative claim did not include a claim for continuing negligent treatment, that is, for failure to properly diagnose and treat the underlying peripheral vascular disease.

The administrative claim and the complaint do not refer to "Buerger's disease" by name; however, Buerger's disease is one type of peripheral vascular disease, see Brief for Appellant at 3 n.4 (citations omitted) (noting that Buerger's disease accounts for approximately 5% of all cases of peripheral vascular disease), and each document refers many times to "peripheral vascular disease." The administrative claim alleged that government doctors and others negligently failed to appreciate the seriousness of McCoy's left heel injury and to treat it in a timely and adequate fashion, failed to treat his pre-existing peripheral vascular disease, failed to timely order certain tests which would have revealed the presence of significant peripheral vascular disease, failed to read or appreciate the significance of his medical history (which included pre-existing peripheral vascular disease and the amputation of his right leg in 1995), and failed to refer him to a vascular disease specialist in a timely manner. See Joint Designated Record at 55 (item 8 in attachment to administrative claim setting forth basis for claim). Although only the complaint expressly alleged continuing negligence, the administrative claim was sufficiently clear to put the government on notice that the claim was based on a continuous course of treatment rather than a single incident. The language of the Federal Bureau of Prisons regional counsel's letter denying the administrative claim supports this conclusion. See id. at 57 (referring to administrative claim as one that prison staff provided "sub-standard medical treatment resulting in the amputation"); Dundon v. United States, 559 F. Supp. at 477 (rejecting government's argument that administrative claim, which was largely directed at alleged negligence in diagnosis and failure to treat but which also explicitly referred to an operation, alleged merely negligence in misdiagnosis and did not include malpractice in surgery).

The complaint essentially repeated those allegations. The complaint alleged that government doctors and others were "negligent in the care and treatment of [McCoy] beginning on or about June 25, 199[6, when he reported his left heel injury to prison medical personnel,] and continuing thereafter until [he] was released from federal confinement in April of 1999," in failing to make an accurate and complete diagnosis

of his condition, failing to appreciate the seriousness of his left heel lesion and to treat it in a timely and adequate fashion, failing to treat his pre-existing peripheral vascular disease, failing to timely order certain tests which would have revealed the presence of significant peripheral vascular disease, failing to refer him to a vascular specialist in a timely manner, failing to prescribe adequate and proper medications, and failing to advise him concerning the hazards of tobacco use and its debilitating effects on his pre-existing peripheral vascular disease. See id. at 2-3 (¶ 8 of the complaint). The final point-- advice to stop smoking-- is significant because abstinence from all tobacco use is apparently the only known method of arresting Buerger's disease. See Brief for Appellant at 3 n.4 (citation omitted).

ACCRUAL OF CAUSE OF ACTION

Thus, because I would hold that the issue of continuing treatment was raised in both the administrative claim and the complaint, I would apply the continuing treatment doctrine to determine when the cause of action accrued.

One could argue that McCoy's cause of action did not accrue until the end of treatment in April 1999, when he was released from federal custody, well after his administrative claim was filed on February 1, 1999. However, "[i]n medical malpractice actions in which the alleged negligence consists of failure to take action, not an affirmative negligent act, factors other than the time of the end of treatment have been considered relevant. One is the deterioration of the plaintiff's condition." Wehrman, 830 F.2d at 1484, citing Raddatz v. United States, 750 F.2d 791, 796 (9th Cir. 1984) (noting that a claim based on failure to diagnose, warn or treat a pre-existing injury accrues when patient becomes aware or through reasonable diligence should have become aware of development of pre-existing condition into more serious condition). Another factor is the gravity of the plaintiff's injury. Id., citing Sanders v. United States, 551 F.2d 458, 460 (D.C. Cir. 1977) (per curiam) (noting that when facts

become so grave as to alert a reasonable person that there may have been negligence related to the treatment received, statute of limitations begins to run); see United States v. Reilly, 513 F.2d 147, 150 (8th Cir. 1975) (noting plaintiff's inability to speak was extreme and unexpected consequence of treatment sufficient to put her on notice that she may have been legally wronged).

It was not necessary in Wehrman to decide whether to adopt either factor to limit the scope of the continuing treatment doctrine. See id. However, under either the deterioration of the plaintiff's condition factor or the gravity of the plaintiff's injury factor, McCoy's cause of action accrued before the end of treatment.

As noted by the majority opinion, the district court found that "McCoy knew of his doctors' breach of duty as soon as the leg was amputated [on January 23, 1997]." Slip op. at 4, 6. The district court used pre-Kubrick terminology by referring to "breach of duty." See, e.g., Osborn v. United States, 918 F.2d 724, 731 (8th Cir. 1990) (noting that, post-Kubrick, question is when the plaintiff actually knew or in exercise of reasonable diligence should have known cause and existence of injury). However, given the dramatic and undisputed facts in the present case, the deterioration of his pre-existing condition and the gravity of the injury were sufficient to make McCoy aware of the existence and cause of his injury. McCoy does not dispute the severity and deterioration of his condition. McCoy was also unfortunately all too aware of the danger posed by infection in light of his pre-existing peripheral vascular disease, even though he did not know he had Buerger's disease specifically, due to the infection and subsequent amputation of his right leg in 1995. This is not a case in which his doctors had assured him that his worsening condition was a normal consequence of a medical procedure, see Raddatz, 750 F.2d at 796, or the natural progression of his condition. See Tyminski v. United States, 481 F.2d 257, 260 (3d Cir. 1973). Nor did his doctors repeatedly advise him against a corrective procedure. See Wehrman, 830 F.2d at 1484. For this reason, I would apply the continuous treatment doctrine and hold that his

-11-

FTCA cause of action accrued, before the end of treatment, on January 23, 1997, the date of the amputation.

TOLLING RUNNING OF STATUTE OF LIMITATIONS

Next, I would apply the continuing treatment doctrine to toll the running of the statute of limitations as follows. Under the continuing treatment doctrine, the statute of limitations period is not tolled by "merely intermittent" medical services, see Page v. United States, 729 F.2d 818, 823 n.36 (D.C. Cir. 1984), or by the mere fact that the plaintiff "continued to receive treatment at facilities owned and operated by the government and was continuously treated by government physicians . . .where a patient receives improper care from one government physician and is thereafter treated by others not accused of that malpractice." Dundon, 559 F. Supp. at 473. Here, McCoy has not alleged "merely intermittent" medical services. He was treated repeatedly by government doctors and others, from June 1996 until early January 1997, at several different medical facilities, both government and non-government. He also received extensive treatment after the amputation from government doctors first at the federal prison medical center in Springfield, Missouri (until December 1997), then at the federal prison in Allenwood, Pennsylvania (until March 1998), and then again in Springfield (until he was transferred to state custody in April 1999).

This court has rejected the argument that the continuous treatment doctrine requires a relationship with a single physician. See Wehrman, 830 F.2d at 1484-85 (holding statute of limitations period could be tolled by continuing treatment doctrine where plaintiff was treated by many different VA doctors at the same VA facility on same plan of treatment over 22 years). This is not a case in which the plaintiff alleged that he received improper care from government doctors in different government hospitals but was thereafter treated by others not accused of that malpractice. See Ulrich, 853 F.2d at 1081 (holding statute of limitations period was tolled by continuing

treatment doctrine where plaintiff was treated properly by doctors in one division in order to correct negligence of different doctors in another division of same hospital); Dundon, 559 F. Supp. at 473 (holding statute of limitations period not tolled by continuing treatment doctrine where the plaintiff was treated by different VA doctors in different VA hospitals but did not allege treatment after November 1975 by any of the doctors claimed to be responsible for misdiagnosis in August 1975). Cf. Otto v. National Institutes of Health, 815 F.2d 985, 988-89 (4th Cir. 1987) (holding continuing treatment doctrine applied even though plaintiff was treated by private doctors between transplant surgeries by government doctors because such treatment was rendered at advice and under direction of government doctors, to whom private doctors consistently and repeatedly deferred). Rather, McCoy alleged that the entire course of diagnosis and treatment of his Buerger's disease, by different government doctors and others at different government and other medical facilities, including the amputation and post-amputation treatment, was negligent.

Thus, although McCoy's cause of action accrued on January 23, 1997, his continuing treatment at the federal prison medical center in Springfield tolled the running of the statute of limitations until at least December 16, 1997, when he was transferred to the federal prison in Allenwood. Since he filed his administrative claim on February 1, 1999, within 2 years of December 16, 1997, his administrative claim was timely filed.

Assuming that our circuit requires that any corrective treatment must be negligent, see slip op. at 5-6, that factor has been met in the present case because, as noted above, McCoy alleged that the entire course of diagnosis and treatment of his peripheral vascular disease, or Buerger's disease, including the amputation and post-amputation treatment, was negligent. For that reason, it is irrelevant whether McCoy's claim also alleged negligence with respect to the amputation and post-amputation treatment. It is enough for statute of limitations analysis that he

-13-

alleged negligence in the corrective treatment he received after the amputation, which included the treatment of his peripheral vascular disease.  See Brief for Appellant at 9, 14-17 (alleging negligence in failure to properly diagnose and treat peripheral vascular disease, specifically identified as Buerger's disease, including failure to advise him to stop smoking, which resulted in amputation and several post-amputation surgeries); Reply Brief for Appellant at 2 (referring to cause of action as based on the failure to properly diagnose and treat peripheral vascular disease, "described by the government's doctors as Buerger's Disease," which resulted in amputation and other serious medical consequences, and noting that "[w]hether the amputation procedure itself was negligent is another question not currently at issue").

REILLY v. UNITED STATES

Finally, as noted by the majority opinion, slip op. at 6, Reilly v. United States held that "[t]he fact that the appellant continued to receive treatment for her condition well into the two-year period prior to the filing of her administrative claim does not change the result here (referring to accrual of cause of action more than two years earlier)."  513 F.2d at 150 (footnote omitted) (holding that extreme and unexpected consequence, including inability to speak from April to August 1969, was sufficient to put plaintiff on notice that she may have been legally wronged so that cause of action accrued in August 1969, even though she continued to receive treatment for condition well into 2-year period prior to filing administrative claim) (pre-Kubrick case). Although this statement would appear to preclude application of the continuing treatment doctrine to toll the running of the statute of limitations, I am convinced that a close reading of Reilly and the case upon which Reilly relies for that proposition, Tyminski, 481 F.2d at 265 n.5, cited in Reilly, 513 F.2d at 150, indicates that those cases involved application of the continuing treatment doctrine to the accrual of the cause of action and not the tolling of the running of the statute of limitations.  For that

-14-

reason, I do not read <u>Reilly</u> to preclude application of the continuing treatment doctrine to toll the running of the statute of limitations.

In <u>Reilly</u> the alleged malpractice occurred on November 18, 1968, when the plaintiff experienced a severe asthma attack and was placed on a respirator. Within days of being removed from the respirator, she complained to her doctor that her throat was sore and hoarse, and the doctor assured her that the condition was a normal aftereffect of use of the respirator. However, the respirator caused an unusual amount of scar tissue to form on the plaintiff's trachea, a condition known as tracheal stenosis. In April 1969 she underwent tracheal dilation treatment, which did not cure the tracheal stenosis, and she was unable to speak from April to August 1969. She filed her administrative claim on December 29, 1971, claiming that the use of the respirator constituted medical malpractice. The district court found that her cause of action accrued in August 1969, more than two years prior to the filing of the administrative claim. The district court found that the plaintiff knew of the causal relationship between the tracheal stenosis and the use of respirator in January 1969, when her doctors informed her that tracheal stenosis was a rare aftereffect of the use of the respirator. 513 F.2d at 149. The district court also noted that the plaintiff could rely on the statements of her doctors that tracheal stenosis was a normal occurrence of the treatment she had received or her faith in their efforts to cure it. <u>Id.</u> at 150. However, the district court decided that, by August 1969, her condition had become so grave-- she was unable to speak-- that her cause of action accrued at that time, despite the assurances of her doctors. <u>Id.</u> (<u>Reilly</u> was decided before <u>Kubrick</u> and so its analysis refers to accrual of the cause of action when the plaintiff knew that she may have been "legally wronged"). This court affirmed and rejected the plaintiff's argument that the statute of limitations had not run because she had received treatment for her condition well into the two-year period prior to the filing of her administrative claim. This court noted "the [continuing treatment] rule does not apply when the claimant is aware of the acts constituting negligence." <u>Id., citing Tyminski</u>, 481 F.2d at 265 n.5. Even though

the language refers to the running of the statute of limitations, the analysis actually refers to the accrual of the cause of action, id., citing Tyminski, 481 F.2d at 264 n.5 (noting that "when a person knows of the acts constituting negligence . . . , little, if any, investigation is necessary to determine whether a meritorious cause of action exists"), and, as discussed below, that is precisely the context in which the continuing treatment doctrine is discussed in Tyminski, the case cited by Reilly.

In Tyminski, which, like Reilly, is a pre-Kubrick case, the plaintiff had been injured by shrapnel during World War II. He had progressive difficulty walking and increased pain and, after tests, was diagnosed as having an arteriovenus angioma (AVA), a type of lesion on the spinal cord. An operation was performed on July 17, 1957. Within days of the operation, the plaintiff began to lose control of his lower extremities and developed paraplegia. He was persistently informed by his doctors that the paraplegia was due to the natural progression of his AVA. However, the district court found that the paraplegia was caused by post-operative bleeding and that the defendants were negligent in failing to diagnose the cause of the paralysis and to operate to stop the bleeding. The plaintiff was discharged from the hospital in December 1959 and was readmitted to the hospital many times for treatment for the paraplegia, including multiple surgeries, until his death in June 1969. In the meantime, the plaintiff had repeatedly (and desperately) sought additional veterans' benefits, and, in June 1964, one of the grounds included a reference to the 1957 operation as a cause of the paralysis. The district court rejected the government's argument that the cause of action accrued at the latest by June 1964 and, therefore, the suit filed in January 1967 was untimely filed.

The court of appeals affirmed and held that the district court did not clearly err in finding that the claim had not accrued more than two years before the filing of the complaint. 481 F.2d at 264. The court first agreed that the record amply supported the conclusion that the plaintiff did not discover the acts constituting malpractice more than

-16-

two years before the action was filed. Id. The court next decided that the plaintiff in the exercise of reasonable diligence should not have discovered the acts constituting negligence, noting that he had very little reason to doubt that his injuries were caused by the natural progression of the AVA, his doctors had told him that paralysis could have occurred at any time because of the possibility of thrombosis, he had received continuous medical treatment from June 1957 to at least 1962, and he had made repeated efforts to ascertain some medical basis for increasing his disability payments over the years. Id. at 264-65. With respect to the continuous medical treatment, the court noted that

> [r]easonable diligence does not require that a person who does not know of the acts constituting malpractice and who has little reason to doubt that his [or her] injury resulted from the natural progression of a pre-operative disorder interrupt the care he [or she] is receiving to cure his [or her] injuries in order to ascertain whether the persons providing care negligently caused his [or her] injuries.

Id. at 264 (footnote omitted).

In the footnote cited in Reilly, the continuing treatment doctrine is discussed in the context of the accrual of the cause of action. The plaintiff had argued on appeal that continuous treatment should act as an alternative test for determining when a claim accrues under the FTCA. The court rejected that argument, finding

> no value in the contention that a person who knows of the existence of the acts upon which his [or her] claim for negligence in a medical malpractice case is based may nevertheless forestall bringing suit until the treatment for his [or her] injuries is complete. The rationale for the continuous treatment rule as expressed by the New York Court of Appeals in Borgia v. City of New York, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962), does, however, have value in determining reasonable diligence to discover the acts constituting negligence. For this reason we do not reject the rule completely as did the Ninth Circuit in Ashley v. United States,

-17-

413 F.2d 490 (9th Cir. 1969). The <u>Ashley</u> court viewed the rule's rationale as only applicable, if at all, to situations in which physicians conspire to conceal their negligence from the patient. Concealment, however, is not the rationale for the rule expressed in <u>Borgia v. City of New York, supra</u>, and <u>Kossick v. United States</u>, 330 F.2d 933, 936 (2d Cir.), <u>cert. denied</u>, 379 U.S. 837 (1964). Rather, the rule <u>is premised on the notion that a person should not be required to investigate the cause of his injuries or to bring suit while receiving necessary treatment for the injuries. The interest in preventing stale claims convinces us that this rationale for the rule has no merit when a person knows of the acts constituting negligence. In this situation little, if any, investigation is necessary to determine whether a meritorious cause of action exists.</u> A different situation is posed, however, when a person does not know of the acts constituting negligence. Under these circumstances the rationale for the continuous treatment test has value in determining the exercise of reasonable diligence to discover the acts constituting negligence. In the case <u>sub judice</u> there exist factors in addition to continuous treatment which necessarily enter into a determination of reasonable diligence.

<u>Id.</u> n.5 (underscoring text cited in <u>Reilly</u>).

Thus, even though the language used in <u>Reilly</u> to reject applying the continuing treatment doctrine refers to the tolling of the running of the statute of limitations, the analysis actually refers to the accrual of the cause of action because that is the context in which the continuing treatment doctrine is discussed in both <u>Reilly</u> and in <u>Tyminski</u>, the case upon which it relies.

In sum, I would hold that McCoy's claim was timely filed because McCoy did raise an issue of continuing negligent treatment in his administrative claim and therefore could raise the continuing treatment doctrine in court; the continuing treatment doctrine postponed the accrual of his cause of action until January 23, 1997, the date of the amputation, at which time his pre-existing condition had so deteriorated and become so grave that he had to have been aware of the existence and probable cause of his injury; and the continuing treatment doctrine tolled the running of the statute of

limitations until some point after February 1, 1997, two years before he filed his administrative claim, because he continued to receive allegedly negligent treatment for his underlying peripheral vascular disease, including the amputation and post-amputation treatment, until December 1997, when he was transferred from the federal prison medical center to Allenwood.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.